JAMES F. MEEHAN & another[1] vs. MAURICE F. SHAUGHNESSY
& others;[2] CYNTHIA J. COHEN & others,[3]
third-party defendants.

Suffolk.    October 6, 1988. — March 28, 1989.

Present: HENNESSEY, C.J., WILKINS, LIACOS, LYNCH, & O'CONNOR, JJ.

*Partnership*, Accounting, Dissolution, Withdrawal of partner. *Fiduciary.*
*Attorney at Law*, Fiduciary duty, Attorney-client relationship, Canons
of ethics. *Practice, Civil*, Burden of proof.

Discussion of a partner's statutory right under G. L. c. 108A to cease his
or her association with a partnership, and such a partner's statutory right
to an allocation of a share of the assets of the partnership. [428-430]

An agreement establishing a partnership for the practice of law was inter-
preted to permit a withdrawing partner, upon payment to the partnership
of a "fair charge" and dependent upon the partner's compliance with
fiduciary obligations, to remove from the partnership any client who
freely chose to retain him or her as legal counsel, regardless whether
the client's case came to the firm through the personal efforts of the
departing partner. [430-433]

At the trial of claims by a law partnership against two of its former partners
who terminated their association with the partnership in order to start
their own firm, the judge was warranted in concluding that the former
partners did not improperly, in breach of their fiduciary duty, handle
cases for their own benefit, as distinct from the partnership's benefit,
after deciding to leave the partnership. [434-435]

At the trial of claims by a law partnership against two of its former partners
who terminated their association with the partnership in order to start
their own firm, the judge was warranted in concluding that the activities

---

[1] Leo V. Boyle.

[2] Robert L. Farrell, William A. Cotter, Jr., James F. Fitzgerald, Jr., John
J. Mahoney, Louis P. Massaro, Jr., Barry R. McDonough, Francis E.
Dooley, Jr., Frederick S. Gilman, Robert M. Hacking, Paul C. Kelly,
Joseph M. McDonnell, Charles B. Gray, William H. Murphy, Mary Mor-
rissey Sullivan, Richard L. Neumeier, Thomas P. O'Reilly, and Robert T.
Gill. The defendants were named individually and as partners of Parker,
Coulter, Daley & White.

[3] Steven H. Schafer and Meehan, Boyle & Cohen, P.C.

of the former partners in making various logistical arrangements for a new firm, after deciding to leave the partnership, did not constitute competition with the partnership in violation of their fiduciary duty. [435-436]

At the trial of claims by a law partnership against two of its former partners who terminated their association with the partnership in order to start their own firm, the judge's findings of fact compelled the conclusion that the former partners had breached their fiduciary duty to the partnership by engaging in unfair, preemptive tactics to secure clients' consent to the removal of their cases from the partnership. [436-438]

Two attorneys employed by a law partnership in the respective positions of "junior partner" and associate violated their fiduciary duty to the partnership in that they, together with two partners who were terminating association with the partnership in order to start their own firm, participated in unfair, preemptive tactics to secure clients' consent to the removal of their cases from the partnership. [438]

A law partnership's recovery against two of its former partners was to be limited to losses that flowed from the former partners' breach of their fiduciary duty to the partnership. [438-440]

Where, on appeal of an action between a law partnership and two of its former partners who terminated their association with the partnership in order to start their own firm, this court concluded that the former partners had breached their fiduciary duty to the partnership by engaging in unfair tactics to secure clients' consent to the removal of cases from the partnership, the matter was remanded for further proceedings at which the judge was to determine whether the former partners had met their burden of proving in each instance that the client would have consented to removal in the absence of any breach of fiduciary duty. [440-442]

Statement of factors relevant to a determination whether a client of a law partnership freely consented to the removal of the client's case from the partnership by certain attorneys who were terminating their association with the partnership in order to start their own firm. [442-444]

In an action between a law partnership and two of its former partners where it was held that the former partners breached their fiduciary duty to the partnership by engaging in unfair tactics to acquire clients' consent to the removal of their cases from the partnership, if, on remand, the judge determined that the clients did not in fact freely consent, then a constructive trust in favor of the former partnership was to be imposed on the profits the former partners received on those cases and the profits were to be treated as earned in the ordinary course of business by the partnership as constituted before the withdrawal of the two former partners. [445-448]

In an action between a law partnership and two attorneys it had formerly employed as a "junior partner" and an associate, where it was held that the two attorneys breached their fiduciary duty to the partnership by participating in unfair tactics to acquire clients' consent to the removal

of their cases from the partnership, if, on remand, the judge determined
that the clients did not in fact freely consent, then a constructive trust
for the benefit of the partnership was to be imposed on the profits that
either attorney received on those cases. [448]


CIVIL ACTION commenced in the Superior Court Department
on April 26, 1985.

The case was heard by *Robert L. Steadman, J.*

The Supreme Judicial Court granted requests for direct appellate review.

*John J. Curtin, Jr. (Meghan H. Magruder & Rory Fitz-
Patrick* with him) for Maurice F. Shaughnessy & others.

*Edward J. Barshak (Regina E. Roman* with him) for James
F. Meehan & another.

HENNESSEY, C.J. The plaintiffs, James F. Meehan (Meehan)
and Leo V. Boyle (Boyle), were partners of the law firm,
Parker, Coulter, Daley & White (Parker Coulter). After
Meehan and Boyle terminated their relationship with Parker
Coulter to start their own firm, they commenced this action
both to recover amounts they claim the defendants, their former
partners, owed them under the partnership agreement, and to
obtain a declaration as to amounts they owed the defendants
for work done at Parker Coulter on cases they removed to their
new firm. The defendants (hereinafter collectively Parker Coul-
ter)[4] counterclaimed that Meehan and Boyle violated their
fiduciary duties, breached the partnership agreement, and tor-
tiously interfered with their advantageous business and contrac-
tual relationships. As grounds for these claims, Parker Coulter
asserted that Meehan and Boyle engaged in improper conduct
in withdrawing cases and clients from the firm, and in inducing
employees to join the new firm of Meehan, Boyle & Cohen,
P.C. (MBC). Parker Coulter also filed a third-party action with
similar claims against MBC and against Cynthia J. Cohen

---

[4] When a partner leaves a partnership, the partnership is dissolved. G. L.
c. 108A, § 29 (1986 ed.). When necessary, we will distinguish between
the Parker, Coulter, Daley & White which included Meehan and Boyle as
partners, and which has been dissolved, and the current Parker, Coulter,
Daley & White, which includes only the defendants as partners.

(Cohen), a former junior partner, and Steven H. Schafer (Schafer), a former associate, who, among others, left the firm to join MBC.

After a jury-waived trial, a Superior Court judge rejected all of Parker Coulter's claims for relief, and found that Meehan and Boyle were entitled to recover amounts owed to them under the partnership agreement. The judge also found, based on the partnership agreement and a quantum meruit theory, that Parker Coulter was entitled to recover from Meehan and Boyle for time billed and expenses incurred on the cases Meehan and Boyle removed to their own firm. Parker Coulter appealed from the judgment, and we granted direct appellate review.

Although we are in agreement with most of the judge's reasoning and conclusions which he reached after lengthy and painstaking proceedings, we nevertheless reverse the judgment entered below and remand for further findings and a hearing, consistent in all respects with this opinion. This result follows from our conclusion, *infra*, that the judge erred in deciding that Meehan and Boyle acted properly in acquiring consent to remove cases to MBC.[5]

We summarize the facts as found by the judge. Aside from certain conclusions which the judge reached, and which we address in more detail below, the parties agree that these findings were warranted by the evidence. Parker, Coulter, Daley & White is a large partnership which specializes in litigation on behalf of both defendants and plaintiffs. Meehan joined the firm in 1959, and became a partner in 1963; his practice focuses primarily on complex tort litigation, such as product liability and aviation defense work. Boyle joined Parker Coulter in 1971, and became a partner in 1980; he has concentrated on

---

[5] We repeatedly, later in this opinion, refer to "preemptive conduct" of Meehan and Boyle, as well as their "breach of duty." Undoubtedly these are accurate descriptions, but we do not wish to leave the impression that the MBC attorneys were unfair in the totality of their conduct in departing from the firm. For instance, we recount early in this opinion that Meehan and Boyle left undisturbed with their partners, and made no attempt to claim, a very large amount of business which Meehan had attracted to Parker Coulter.

plaintiffs' work. Both have developed outstanding reputations as trial lawyers in the Commonwealth. Meehan and Boyle each were active in the management of Parker Coulter. They each served, for example, on the partnership's executive committee and, as members of this committee, were responsible for considering and making policy recommendations to the general partnership. Boyle was also in charge of the "plaintiffs department" within the firm, which managed approximately 350 cases. At the time of their leaving, Meehan's interest in the partnership was 6% and Boyle's interest was 4.8%.

Meehan and Boyle had become dissatisfied at Parker Coulter. On June 27, 1984, after unsuccessfully opposing the adoption of a firm-wide pension plan, the two first discussed the possibility of leaving Parker Coulter. Another partner met with them to discuss leaving but told them their proposed firm would not be suitable for his type of practice. On July 1, Meehan and Boyle decided to leave Parker Coulter and form their own partnership.

Having decided to establish a new firm, Meehan and Boyle then focused on whom they would invite to join them. The two spoke with Cohen, a junior partner and the de facto head of Parker Coulter's appellate department, about joining the new firm as a partner. They arranged to meet with her on July 5, and told her to keep their conversations confidential. The day before the July 5 meeting, Boyle prepared two lists of what he considered to be his cases. The lists contained approximately eighty to 100 cases, and for each case indicated the status, fee arrangement, estimated settlement value, and potential fee to MBC. Boyle gave these lists to Cohen for her to examine in preparation for the July 5 meeting.

At the July 5 meeting, Meehan and Boyle outlined to Cohen their plans for the new firm, including their intent to offer positions to Schafer, Peter Black (Black), and Warren Fitzgerald (Fitzgerald), who were associates at Parker Coulter. Boyle stated that he hoped the clients he had been representing would go with him to the new firm; Meehan said he would take the aviation work he had at Parker Coulter with him. Both stated that they felt others at Parker Coulter were getting paid

as much as or more than they were, but were not working as hard. Cohen decided to consider the offer from Meehan and Boyle, and agreed to keep the plans confidential until formal notice of the separation was given to the partnership. Although the partnership agreement required a notice period of three months, the three decided to give only thirty days' notice. They chose to give shorter notice to avoid what they believed would be an uncomfortable situation at the firm, and possible retaliatory measures by the partnership. Meehan and Boyle had agreed that they would leave Parker Coulter on December 31, 1984, the end of Parker Coulter's fiscal year.

During the first week of August, Cohen accepted the offer to join the new firm as a partner. Her primary reason for leaving Parker Coulter to join MBC was that she enjoyed working with Meehan and Boyle.

In July, 1984, Boyle offered a position at MBC to Schafer, who worked closely with Boyle in the plaintiffs department. Boyle told Schafer to organize his cases, and "to keep an eye towards cases to be resolved in 1985 and to handle these cases for resolution in 1985 rather than 1984." He also told Schafer to make a list of cases he could take with him to MBC, and to keep all their conversations confidential.

Late in the summer of 1984, Meehan asked Black and Fitzgerald to become associates at MBC. Fitzgerald had worked with Meehan in the past on general defense work, and Black worked with Meehan, particularly in the aviation area. Meehan was instrumental in attracting Black, who had previously been employed by U.S. Aviation Underwriters (USAU), to Parker Coulter. Although Black had already considered leaving Parker Coulter, he was concerned about whether USAU would follow him to a small firm like MBC, and wanted to discuss his leaving Parker Coulter with the vice president of USAU. In October, 1984, Black and Meehan met with the USAU vice president in New York. They later received assurances from him that he would be interested in sending USAU business to the proposed new firm. Black then accepted the offer to join MBC. Fitzgerald also accepted. Schafer, Black, and Fitzgerald

were the only associates Meehan, Boyle, and Cohen approached concerning the new firm.

During July and the following months, Meehan, Boyle, and Cohen made arrangements for their new practice apart from seeking associates. They began to look for office space and retained an architect. In early fall, a lease was executed on behalf of MBC in the name of MBC Realty Trust. They also retained an attorney to advise them on the formation of the new firm.

Boyle was assigned the task of arranging financing. He prepared a personal financial statement and obtained a bank loan in September, 1984. During that fall, two other loans were made on MBC's credit. Cohen, at the request of an accountant, had been trying to develop projections of MBC's expected revenue in order to obtain long-term financing. The accountant requested a list of cases with indications as to MBC's expected fees for this purpose. In November, Boyle updated and revised the list of cases he expected to take to MBC which he had compiled in July. The November list contained approximately 135 cases. The increase in Boyle's case load from July to November resulted in part from the departure of a Parker Coulter attorney in early September, 1984. Boyle was in charge of reassigning the cases this attorney worked on. Although another attorney requested transfer of some of these cases, Boyle assigned none to that attorney, and assigned most of the cases to himself and Schafer. Meehan, Cohen, and Black also prepared lists of cases which they anticipated they would remove, and included the potential fee each case would generate for MBC.

Toward the end of November, Boyle prepared form letters to send to clients and referring attorneys as soon as Parker Coulter was notified of the separation. He also drafted a form for the clients to return to him at his home address authorizing him to remove cases to MBC. An outside agency typed these materials on Parker Coulter's letterhead. Schafer prepared similar letters and authorization forms.

While they were planning their departure, from July to approximately December, Meehan, Boyle, Cohen, Schafer,

Black, and Fitzgerald all continued to work full schedules. They settled cases appropriately, made reasonable efforts to avoid continuances, tried cases, and worked on discovery. Each generally maintained his or her usual standard of performance.

Meehan and Boyle had originally intended to give notice to Parker Coulter on December 1, 1984. Rumors of their leaving, however, began to circulate before then. During the period from July to early fall, different Parker Coulter partners approached Meehan individually on three separate occasions and asked him if the rumors about his leaving were true. On each occasion, Meehan denied that he was leaving. On November 30, 1984, a partner, Maurice F. Shaughnessy (Shaughnessy), approached Boyle and asked him whether Meehan and Boyle intended to leave the firm. Shaughnessy interpreted Boyle's evasive response as an affirmation of the rumors. Meehan and Boyle then decided to distribute their notice that afternoon, which stated, as their proposed date for leaving, December 31, 1984. A notice was left on the desk of each partner. When Meehan, Boyle, and Cohen gave their notice, the atmosphere at Parker Coulter became "tense, emotional and unpleasant, if not adversarial."

On December 3, the Parker Coulter partners appointed a separation committee and decided to communicate with "important sources of business" to tell them of the separation and of Parker Coulter's desire to continue representing them. Meehan and Boyle asked their partners for financial information about the firm, discussed cases and clients with them, and stated that they intended to communicate with clients and referring attorneys on the cases in which they were involved. Sometime during the week of December 3, the partners sent Boyle a list of cases and requested that he identify the cases he intended to take with him.

Boyle had begun to make telephone calls to referring attorneys on Saturday morning, December 1. He had spoken with three referring attorneys by that date and told them of his departure from Parker Coulter and his wish to continue handling

their cases. On December 3, he mailed his previously typed letters and authorization forms, and by the end of the first two weeks of December he had spoken with a majority of referring attorneys, and had obtained authorizations from a majority of clients whose cases he planned to remove to MBC.

Although the partners previously were aware of Boyle's intention to communicate with clients, they did not become aware of the extent of his communications until December 12 or 13. Boyle did not provide his partners with the list they requested of cases he intended to remove until December 17. Throughout December, Meehan, Boyle, and Schafer continued to communicate with referring attorneys on cases they were currently handling to discuss authorizing their transfer to MBC. On December 19, 1984, one of the partners accepted on behalf of Parker Coulter the December 31 departure date and waived the three-month notice period provided for by the partnership agreement. Meehan, Boyle, and Cohen formalized their arrangement as a professional corporation on January 1, 1985.

MBC removed a number of cases from Parker Coulter. Of the roughly 350 contingent fee cases pending at Parker Coulter in 1984, Boyle, Schafer, and Meehan removed approximately 142 to MBC. Meehan advised Parker Coulter that the 4,000 asbestos cases he had attracted to the firm would remain, and he did not seek to take certain other major clients. Black removed thirty-five cases; Fitzgerald removed ten; and Cohen removed three. A provision in the partnership agreement in effect at the separation provided that a voluntarily retiring partner, upon the payment of a "fair charge," could remove "any matter in which the partnership had been representing a client who came to the firm through the personal effort or connection of the retiring partner," subject to the right of the client to stay with the firm. Approximately thirty-nine of the 142 contingent fee cases removed to MBC came to Parker Coulter at least in part through the personal efforts or connections of Parker Coulter attorneys other than Meehan, Boyle, Cohen, Schafer, Black, or Fitzgerald. In all the cases removed to MBC, however, MBC attorneys had direct, existing relationships with the clients. In all the removed cases, MBC attorneys

communicated with the referring attorney or with the client directly by telephone or letter. In each case, the client signed an authorization.

Schafer subsequently separated his practice from MBC's. He took with him a number of the cases which had been removed from Parker Coulter to MBC.

Based on these findings, the judge determined that the MBC attorneys did not manipulate cases, or handle them differently as a result of their decision to leave Parker Coulter. He also determined that Parker Coulter failed to prove that the clients whose cases were removed did not freely choose to have MBC represent them. Consequently, he concluded that Meehan and Boyle neither violated the partnership agreement nor breached the fiduciary duty they owed to their partners. In addition, the judge also found that Meehan and Boyle did not tortiously interfere with Parker Coulter's relations with clients or employees. He similarly rejected Parker Coulter's claims against Cohen and Schafer.

1. *Statutory Considerations; the Partnership Agreement.*

Before we address Parker Coulter's claims of wrongdoing, we first review the statutory right a partner has to cease his or her association with a partnership, and the statutory right the partner has to assets of the partnership upon leaving. We then examine how the partners in this case have modified these statutory rights in their partnership agreement.

General Laws c. 108A (1986 ed.) governs the formation, conduct, and liquidation of partnerships. Under § 29, a "change in the relation of the partners caused by any partner ceasing to be associated in the carrying on . . . of the business" results in dissolution of the partnership. The statute enumerates specific changes which cause a dissolution. A partnership may be dissolved at any time, for example, by the express will of a partner. G. L. c. 108A, § 31 (1) (*b*), (2).

Where a partnership agreement provides that the partnership is to continue indefinitely, and the partnership is therefore "at will," a partner has the right to dissolve the partnership, and the dissolution occurs "[w]ithout violation of the agreement between the partners." G. L. c. 108A, § 31 (1). See *Johnson*

v. *Kennedy*, 350 Mass. 294, 298 (1966); *Steele* v. *Estabrook*, 232 Mass. 432, 439 (1919). In a dissolution which occurs "[w]ithout violation of the agreement," the statute expressly defers to the method of dividing the partnership's assets which the parties bargained for in their partnership agreement. G. L. c. 108A, § 38 (1). In contrast, where the partnership agreement provides that the partnership is to continue for a definite term, a partner has merely the power to dissolve, and the dissolution occurs "[i]n contravention of the agreement between the partners." G. L. c. 108A, § 31 (2). If the dissolution occurs in contravention of the agreement, the dissolving partner is subject to certain damages, and the statute does not expressly allow the partnership agreement to control the division of the partnership's assets. G. L. c. 108A, § 38 (2). See generally 2 A.R. Bromberg & L.E. Ribstein, Partnership § 7.02 (c) (1988).[6]

In addition to giving a partner the power to dissolve a partnership, and to specifying the effects of a premature dissolution, c. 108A also provides a method for dividing the assets of a dissolved partnership. In the absence of an agreement otherwise, upon dissolution a partner may liquidate the partnership's assets and obtain his or her share of the surplus. G. L. c. 108A, § 38 (1). Because it may be impossible to liquidate certain partnership assets immediately, the statute provides that "[o]n dissolution [a] partnership is not terminated, but continues until the winding-up of partnership affairs is completed." G. L.

---

[6] The wrongful conduct described in §§ 31 and 38 consists of dissolving the partnership before its term. We have noted that the dissolution of a partnership at will, "however unseemly in manner and method, [is] not a legal wrong." *Johnson, supra* (citing G. L. c. 108A, § 38 [1]). This statement from *Johnson* recognizes that dissolution of a partnership at will is not "wrongful" or "in contravention of the agreement" within the meaning of either § 31 or § 38, and is therefore not a "legal wrong" which would trigger the remedies of § 38 (2). See *id.* We emphasize that the § 38 (2) remedy is in addition to, and distinct from, the remedy provided by § 21 for wrongdoing which is not connected with a premature dissolution. Cf. Gaberman, Corporations and Partnerships: Wrongful Dissolution and Damages for Breach of Agreement, 1966 Ann. Survey Mass. Law § 8.8, at 122 (1966) (suggesting that statute can be read to allow no remedy for intentional misconduct at dissolution).

c. 108A, § 30. Each partner has a fiduciary duty to wind up this unfinished partnership business solely for the benefit of the former partnership. G. L. c. 108A, §§ 18 (*f*), 21, 35. See *Rosenfeld, Meyer & Susman* v. *Cohen*, 146 Cal. App. 3d 200, 216-217 (1983), *S.C.*, 191 Cal. App. 3d 1035 (1987); *Resnick* v. *Kaplan*, 49 Md. App. 499, 507-508 (1980), quoting *Frates* v. *Nichols*, 167 So. 2d 77, 80-81 (Fla. Dist. Ct. App. 1964). See generally Note, Winding Up Dissolved Law Partnerships: The No-Compensation Rule and Client Choice, 73 Calif. L. Rev. 1597, 1604-1610 (1985). Once the windup is complete, the total value of the dissolved· partnership's assets can be determined. Each partner then receives his or her share. G. L. c. 108A, §§ 18, 38 (1).

The Parker Coulter partnership agreement provided for rights on a dissolution caused by the will of a partner which are different from those c. 108A provides.[7] Because going concerns are typically destroyed in the dissolution process of liquidation and windup, see J. Crane & A. Bromberg, Partnership 419 (1968), the agreement minimizes the impact of this process. The agreement provides for an allocation to the departing partner of a share of the firm's current net income, and a return of his or her capital contributions. In addition, the agreement also recognizes that a major asset of a law firm is the expected fees it will receive from unfinished business currently being transacted. Instead of assigning a value to the departing partner's interest in this unfinished business, or waiting for the unfinished business to be "wound up" and liquidated, which is the method of division c. 108A provides, the agreement gives the partner the right to remove any case which came to the firm "through the personal effort or connection" of the partner, if the partner compensates the dissolved partnership

---

[7] Chapter 108A is intended to be a type of "form contract." See 1 A.R. Bromberg & L.E. Ribstein, Partnership § 1.01 (d) (1988). Parties are therefore allowed the freedom to provide for rights at dissolution and during the windup period which are different from those provided for in the statute. . See G. L. c. 108A, § 38 (1).

"for the services to and expenditures for the client."[8] Once the partner has removed a case, the agreement provides that the partner is entitled to retain all future fees in the case, with the exception of the "fair charge" owed to the dissolved firm.[9]

Although the provision in the partnership agreement which divides the dissolved firm's unfinished business does not expressly apply to the removal of cases which did not come to Parker Coulter through the efforts of the departing partner, we believe that the parties intended this provision to apply to these cases also. We interpret this provision to cover these additional cases for two reasons. First, according to the Canons of Ethics and Disciplinary Rules Regulating the Practice of Law (S.J.C. Rule 3:07, Canon 2, as amended through 398 Mass. 1108 [1986]), a lawyer may not participate in an agreement which restricts the right of a lawyer to practice law after the termination of a relationship created by the agreement. One reason for this rule is to protect the public. See *Dwyer* v. *Jung*, 133 N.J. Super. 343, 349, aff'd, 137 N.J. Super. 135 (1975); *Hagen* v. *O'Connell, Goyak, & Ball*, 68 Or. App. 700, 703-704 (1984); *Gray* v. *Martin*, 63 Or. App. 173, 181-182 (1983). The strong public interest in allowing clients to retain counsel of their choice outweighs any professional benefits derived from a restrictive covenant. Thus, the Parker Coulter partners could not restrict a departing partner's right to remove any clients who freely choose to retain him or her as their legal counsel. Second, we believe the agreement's carefully drawn

---

[8] The agreement expressly protects a client's right to choose his or her attorney, by providing that the right to remove a case is "subject to the right of the client to direct that the matter be retained by the continuing firm of remaining partners."

[9] The agreement provides that this "fair charge" is a "receivable account of the earlier partnership . . . and [is] divided between the remaining partners and the retiring partner on the basis of which they share in the profits of the firm at the time of the withdrawal." This fair charge is thus treated as an asset of the former partnership. Because the partnership, upon the receipt of the fair charge, gives up all future rights to income from the removed case, the partnership's collective interest in the case is effectively "wound up." The fair charge, therefore, is a method of valuing the partnership's unfinished business as it relates to the removed case.

provisions governing dissolution and the division of assets indicate the partners' strong intent not to allow the provisions of c. 108A concerning liquidation and windup to govern any portion of the dissolved firm's unfinished business.[10] Therefore, based on the partners' intent, and on the prohibition against restrictive covenants between attorneys, we interpret the agreement to provide that, upon the payment of a fair charge, any case may be removed regardless of whether the case came to the firm through the personal efforts of the departing partner. This privilege to remove, as is shown in our later discussion, is of course dependent upon the partner's compliance with fiduciary obligations.

Under the agreement, therefore, a partner who separates his or her practice from that of the firm receives (1) the right to his or her capital contribution, (2) the right to a share of the net income to which the dissolved partnership is currently entitled, and (3) the right to a portion of the firm's unfinished business, and in exchange gives up all other rights in the dissolved firm's remaining assets. As to (3) above, "unfinished business," the partner gives up all right to proceeds from any unfinished business of the dissolved firm which the new, surviving firm retains. Under the agreement, the old firm's unfinished business is, in effect, "wound up" immediately; the departing partner takes certain of the unfinished business of the old, dissolved Parker Coulter on the payment of a "fair charge," and the new, surviving Parker Coulter takes the remainder of the old partnership's unfinished business.[11] The two entities surviving after the dissolution possess "new business," unconnected with that of the old firm, and the former partners no longer have a continuing fiduciary obligation to

---

[10] The parties have not suggested to us a method, and one is not readily apparent, of applying the statute to only a portion of the firm's unfinished business.

[11] A more equitable provision would require that the new, surviving partnership also pay a "fair charge" on the cases it takes from the dissolved partnership. This "fair charge" from the new firm, as is the "fair charge" from the departing partner, would be an asset of the dissolved partnership, in which the departing partner has an interest.

windup for the benefit of each other the business they shared in their former partnership.

In sum, the statute gives a partner the power to dissolve a partnership at any time. Under the statute, the assets of the dissolved partnership are divided among the former partners through the process of liquidation and windup. The statute, however, allows partners to design their own methods of dividing assets and, provided the dissolution is not premature, expressly states that the partners' method controls. Here, the partners have fashioned a division method which immediately winds up unfinished business, allows for a quick separation of the surviving practices, and minimizes the disruptive impact of a dissolution.

2. *Fiduciary Duties; Breach.*

We now consider Parker Coulter's claims of wrongdoing. Parker Coulter claims that the judge erred in finding that Meehan, Boyle, Cohen, and Schafer fulfilled their fiduciary duties to the former partnership. In particular, Parker Coulter argues that these attorneys breached their duties (1) by improperly handling cases for their own, and not the partnership's benefit, (2) by secretly competing with the partnership, and (3) by unfairly acquiring from clients and referring attorneys consent to withdraw cases to MBC.[12] We do not agree with Parker Coulter's first two arguments but agree with the third. We first address the claims against Meehan and Boyle, and then turn to those against Cohen and Schafer.

It is well settled that partners owe each other a fiduciary duty of "the utmost good faith and loyalty." *Cardullo* v.

---

[12] Parker Coulter does not claim that Meehan and Boyle wrongfully dissolved the partnership by leaving prematurely. The partnership agreement, although providing that the firm "shall continue indefinitely," required that a partner who leaves to continue practicing elsewhere give three-months' advance notice. This, therefore, may not have been a purely "at will" partnership which a partner has a right to dissolve at any time without triggering the remedies of G. L. c. 108A, § 38 (2). See G. L. c. 108A, §§ 31 (1), 38. *Johnson* v. *Kennedy*, 350 Mass. 294, 298 (1966). Here, Parker Coulter waived compliance with the agreement's three-month notice provision. Meehan and Boyle, therefore, dissolved the partnership "[w]ithout violation of the agreement between the partners." G. L. c. 108A, § 31.

*Landau*, 329 Mass. 5, 8 (1952). *Shelley* v. *Smith*, 271 Mass. 106, 115 (1930). *Holmes* v. *Darling*, 213 Mass. 303, 305 (1913). As a fiduciary, a partner must consider his or her partners' welfare, and refrain from acting for purely private gain. *Shelley, supra. Holmes, supra.* Partners thus "may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty." *Donahue* v. *Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 593 (1975). Meehan and Boyle owed their copartners at Parker Coulter a duty of the utmost good faith and loyalty, and were obliged to consider their copartners' welfare, and not merely their own.

Parker Coulter first argues that Meehan and Boyle violated their fiduciary duty by handling cases for their own benefit, and challenges the judge's finding that no manipulation occurred.[13] Parker Coulter attempts to avoid the burden of demonstrating that this finding is clearly erroneous by characterizing it as an "inference," and claiming that, as such, it is entitled to no weight. We disagree. The judge's determination was one of fact, and was based on the assessment of the credibility of individuals with personal knowledge of the facts about which they were testifying. We therefore review this finding under the "clearly erroneous" standard. See *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977).

Parker Coulter also claims that we should disregard the judge's finding of no manipulation because the finding is clearly contradicted by other subsidiary findings, namely that Boyle planned to, and told Schafer to, handle cases for resolution at MBC rather than at Parker Coulter; that Boyle reassigned a number of a departing attorney's cases to himself and Schafer; and that a number of cases which were ready to resolve at Parker Coulter were, in fact, not resolved there. We do not

---

[13] The judge found, specifically, that: "MBC, Schafer, Black and Fitzgerald worked full schedules from July to November 30, 1984, and some beyond. There was no manipulation of the cases nor were the cases handled differently as a result of the decision by MBC to leave Parker Coulter. They tried cases, worked on discovery, settled cases and made reasonable efforts to avoid continuances, to try their cases when reached, and settle where appropriate and in general maintain the same level of industry and professionalism that they had always demonstrated."

agree that there is a conflict. The judge's finding that Boyle spoke of engaging in improper conduct does not require the conclusion that this conduct actually took place. Similarly, his finding that the reassignment of cases did not establish manipulation is consistent with a determination that the reassignment was based on merit and workload. Furthermore, the judge's finding that the MBC attorneys worked full schedules provides a reason for the delayed resolution of certain cases other than the improper motivation which Parker Coulter urges. Finally, Parker Coulter points to no specific case which the MBC attorneys manipulated for their own benefit. There is thus no contradiction between the judge's findings. We have reviewed the record, and conclude that the judge was warranted in determining that Meehan and Boyle handled cases no differently as a result of their decision to leave Parker Coulter, and that they thus fulfilled their fiduciary duty in this respect.

Parker Coulter next argues that the judge's findings compel the conclusion that Meehan and Boyle breached their fiduciary duty not to compete with their partners by secretly setting up a new firm during their tenure at Parker Coulter. We disagree. We have stated that fiduciaries may plan to compete with the entity to which they owe allegiance, "provided that in the course of such arrangements they [do] not otherwise act in violation of their fiduciary duties." *Chelsea Indus.* v. *Gaffney*, 389 Mass. 1, 10, 11-12 (1983). Here, the judge found that Meehan and Boyle made certain logistical arrangements for the establishment of MBC. These arrangements included executing a lease for MBC's office, preparing lists of clients expected to leave Parker Coulter for MBC, and obtaining financing on the basis of these lists. We believe these logistical arrangements to establish a physical plant for the new firm were permissible under *Chelsea Indus.*, especially in light of the attorneys' obligation to represent adequately any clients who might continue to retain them on their departure from Parker Coulter. Canons of Ethics and Disciplinary Rules Regulating the Practice of Law (S.J.C. Rule 3:07, Canon 7, as appearing in 382 Mass. 784 [1981]). There was no error in

the judge's determination that this conduct did not violate the partners' fiduciary duty.[14]

Lastly, Parker Coulter argues that the judge's findings compel the conclusion that Meehan and Boyle breached their fiduciary duties by unfairly acquiring consent from clients to remove cases from Parker Coulter. We agree that Meehan and Boyle, through their preparation for obtaining clients' consent, their secrecy concerning which clients they intended to take, and the substance and method of their communications with clients, obtained an unfair advantage over their former partners in breach of their fiduciary duties.

A partner has an obligation to "render on demand true and full information of all things affecting the partnership to any partner." G. L. c. 108A, § 20. See *Shelley, supra* at 115. On three separate occasions Meehan affirmatively denied to his partners, on their demand, that he had any plans for leaving the partnership. During this period of secrecy, Meehan and Boyle made preparations for obtaining removal authorizations from clients. Meehan traveled to New York to meet with a representative of USAU and interest him in the new firm. Boyle prepared form letters on Parker Coulter's letterhead for authorizations from prospective MBC clients. Thus, they were "ready to move" the instant they gave notice to their partners. See *BBF, Inc.* v. *Germanium Power Devices Corp.*, 13 Mass. App. Ct. 166, 172 (1982).

On giving their notice, Meehan and Boyle continued to use their position of trust and confidence to the disadvantage of Parker Coulter. The two immediately began communicating with clients and referring attorneys. Boyle delayed providing his partners with a list of clients he intended to solicit until mid-December, by which time he had obtained authorization from a majority of the clients.

---

[14] Parker Coulter also argues that Meehan and Boyle impermissibly competed with the firm by inducing its employees to join MBC. Because Parker Coulter identifies no specific loss resulting from this claimed breach, see, e.g., *Chelsea Indus., supra* at 19 n.23 (costs of retraining new employees), we need not address this issue.

Finally, the content of the letter sent to the clients was unfairly prejudicial to Parker Coulter. The ABA Committee on Ethics and Professional Responsibility, in Informal Opinion 1457 (April 29, 1980), set forth ethical standards for attorneys announcing a change in professional association.[15] Because this standard is intended primarily to protect clients, proof by Parker Coulter of a technical violation of this standard does not aid them in their claims. See *Fishman* v. *Brooks*, 396 Mass. 643, 649 (1986). We will, however, look to this standard for general guidelines as to what partners are entitled to expect from each other concerning their joint clients on the division of their practice. The ethical standard provides that any notice explain to a client that he or she has the right to decide who will continue the representation. Here, the judge found that the notice did not "clearly present to the clients the choice they had between remaining at Parker Coulter or moving to the new firm." By sending a one-side announcement, on Parker Coulter letterhead, so soon after notice of their departure, Meehan and Boyle excluded their partners from effectively presenting their services as an alternative to those of Meehan and Boyle.

Meehan and Boyle could have foreseen that the news of their departure would cause a certain amount of confusion and disruption among their partners. The speed and preemptive character of their campaign to acquire clients' consent took advantage of their partners' confusion. By engaging in these

---

[15] These standards provide the following guidelines for notice to clients:

"(a) the notice is mailed; (b) the notice is sent only to persons with whom the lawyer had an active lawyer-client relationship immediately before the change in the lawyer's professional association; (c) the notice is clearly related to open and pending matters for which the lawyer had direct professional responsibility to the client immediately before the change; (d) the notice is sent promptly after the change; (e) the notice does not urge the client to sever a relationship with the lawyer's former firm and does not recommend the lawyer's employment (although it indicates the lawyer's willingness to continue his responsibility for the matters); (f) the notice makes it clear that the client has the right to decide who will complete or continue the matters; and (g) the notice is brief, dignified, and not disparaging of the lawyer's former firm." See also ABA Committee on Ethics and Professional Responsibility Informal Opinion 1466 (Feb. 12, 1981) (extending Informal Opinion 1457 to departing associates as well as partners).

preemptive tactics, Meehan and Boyle violated the duty of utmost good faith and loyalty which they owed their partners. Therefore, we conclude that the judge erred in deciding that Meehan and Boyle acted properly in acquiring consent to remove cases to MBC.

We next consider Parker Coulter's claims against Cohen and Schafer. We have determined that "[e]mployees occupying a position of trust and confidence owe a duty of loyalty to their employer and must protect the interests of their employer." *Chelsea Indus.*, *supra* at 11. Cohen was a junior partner, and acting head of Parker Coulter's appellate department. Schafer was an associate responsible for a substantial case load. Both had access to clients and information concerning clients and therefore occupied positions of trust and confidence. We conclude that their participation in the preemptive tactics of Meehan and Boyle violated the duty they owed the partnership.

3. *Consequences of Breach.*

Before we examine the consequences of the MBC attorneys' breach of duty, we briefly outline what is at stake. If there had been no breach of duty, the assets of the partnership upon dissolution would be divided strictly according to the partnership agreement. Under the agreement, Meehan and Boyle would be entitled to the return of their capital contributions and their share of the dissolved firm's profits. They would also possess the right to remove cases from the old partnership, and to retain all future fees generated by these cases in excess of the fair charge owed to the partnership for work performed there on the removed cases. Because the fair charge is an asset of the dissolved firm under the agreement, Meehan and Boyle would share in this amount according to their respective interests in the former partnership. Thus, of the fair charges returned to their former partnership, Meehan and Boyle would receive their combined 10.8% partnership share, and their former partners would receive the remainder.

Parker Coulter essentially argues that, because of their breach of fiduciary duty, Meehan and Boyle forfeit all rights under the partnership agreement. Thus, Parker Coulter contends, Meehan and Boyle are not entitled to their capital contributions

or their share of the dissolved partnership's profits. More importantly, according to Parker Coulter, because of their breach Meehan and Boyle have lost the right to retain any fees generated by the cases they removed. Instead, Parker Coulter claims, these fees are owed to them directly. Parker Coulter further argues that, because the third-party defendants, Cohen and Schafer, breached their duty to Parker Coulter, they also owe any fees they may receive on removed cases directly to Parker Coulter. Finally, Parker Coulter contends that the MBC attorneys have forfeited all rights to the compensation they received from July through December, 1984. We reject this extreme remedy. First, we examine the consequences to Meehan and Boyle of their breach; then we turn to Cohen and Schafer.

For Parker Coulter to recover any amount in addition to what it would be entitled to receive upon dissolution under the partnership agreement or the statute, there must be a causal connection between its claimed losses and the breach of duty on the part of the MBC attorneys. *Production Mach. Co.* v. *Howe*, 327 Mass. 372, 378 (1951). *Durfee* v. *Durfee & Canning, Inc.*, 323 Mass. 187, 198-199 (1948). *Holmes* v. *Darling*, 213 Mass. 303, 306 (1913). See *BBF, Inc.* v. *Germanium Power Devices Corp.*, 13 Mass. App. Ct. 166, 173 (1982). We have concluded that the MBC attorneys unfairly acquired consent from clients. Parker Coulter, therefore, is entitled to recover only those amounts which flow from this breach of duty.

There is no conceivable connection between the attorneys' breach of duty and Parker Coulter's claims to the capital contributions and profit shares of Meehan and Boyle. We have ruled that a partner does not forfeit his or her right to the accrued profits of a partnership by simply breaching the partnership agreement. *Fisher* v. *Fisher*, 349 Mass. 675, 677 (1965). *Walsh* v. *Atlantic Assocs.*, 321 Mass. 57, 64 (1947). The same rule applies to a partner's capital contributions. These amounts are not a form of liquidated damages to which partners can resort in the event of a breach. We conclude, therefore, that Parker Coulter is not entitled to recover these amounts. The judge correctly found that Meehan and Boyle are entitled to a

return of their capital contributions (their interest, as determined by the judge, in the partners' reserve account and the partners' capital account), and to the receipt of a portion of the old firm's profits (their interest in the income earned but not distributed account).

We similarly reject Parker Coulter's claims that the MBC attorneys should be required to forfeit all compensation during the period of their breach. Parker Coulter is correct in stating that a fiduciary "can be required to forfeit the right to retain or receive his compensation for conduct in violation of his fiduciary duties." *Chelsea Indus.* v. *Gaffney*, 389 Mass. 1, 12 (1983). See *Production Mach. Co.*, *supra* at 379; *BBF, Inc.*, *supra* at 177. Parker Coulter fails to consider, however, that a fiduciary may be required "to repay only that portion of his compensation, if any, that was in excess of the worth of his services to his employer." *Chelsea Indus.*, *supra*. Here, the judge found that throughout the period in question the MBC attorneys worked as hard, and were as productive as they had always been. This finding was warranted, and is unchallenged by Parker Coulter. In these circumstances, we conclude that the value of the MBC attorneys' services was equal to their compensation. Parker Coulter, therefore, is not entitled to this relief.

Parker Coulter's claim that it is entitled to all fees from removed cases, however, rests on a different footing from its claims to compensation, capital contributions, and profit shares. We therefore examine more closely Parker Coulter's allegations of a causal connection between the breach of duty and its loss of clients.

Although the judge found that the MBC attorneys did not breach their fiduciary duties in acquiring consent from clients, he nonetheless stated, as an alternative ground for denying relief on this claim, that Parker Coulter had shown no causal connection between the departing attorneys' acts and its loss of clients. He ruled that Parker Coulter failed to show that clients who left the firm would have remained had the plaintiffs and third-party defendants acted properly. Parker Coulter argues that the standard of causation the judge imposed was too

strict. We agree that the judge's ruling placed an inappropriate burden on Parker Coulter.

In these circumstances, it is appropriate to place on the party who improperly removed the case the burden of proving that the client would have consented to removal in the absence of any breach of duty. See *Knowles* v. *Gilchrist Co.*, 362 Mass. 642, 651 (1972) (where goods are damaged in bailee's hands, bailor is relieved of traditional burden of proving bailee's negligence, and burden is on bailee to prove that loss was not caused by any lack of due care). See also *William Rodman & Sons* v. *State Tax Comm'n*, 373 Mass. 606, 611 (1977) (application of rule to cigarette stamper-wholesaler). We have recognized that shifting the burden of proof may be justified on policy grounds because it encourages a defendant both to preserve information concerning the circumstances of the plaintiff's injury and to use best efforts to fulfil any duty he or she may owe the plaintiff. See *William Rodman & Sons*, *supra*. Based on similar reasoning, courts in other jurisdictions have shifted the burden of proof in cases involving a breach of fiduciary duty. Once it is established that a partner or corporate manager has engaged in self-dealing, or has acquired a corporate or partnership opportunity, these courts require the fiduciary to prove that his or her actions were intrinsically fair, and did not result in harm to the corporation or partnership. See *Ohio Drill & Tool Co.* v. *Johnson*, 498 F.2d 186, 195 (6th Cir. 1974) (interpreting Ohio common law); *Fliegler* v. *Lawrence*, 361 A.2d 218, 221 (Del. 1976); *Newton* v. *Hornblower, Inc.*, 224 Kan. 506, 518 (1978); *Huffington* v. *Upchurch*, 532 S.W.2d 576, 579 (Tex. 1976).

We conclude that Meehan and Boyle had the burden of proving no causal connection between their breach of duty and Parker Coulter's loss of clients. Cf. *Energy Resources Corp.* v. *Porter*, 14 Mass. App. Ct. 296, 302 (1982) (fiduciary who secretly acquires corporate opportunity barred from asserting that corporation would have been unable to exploit opportunity). Proof of the circumstances of the preparations for obtaining authorizations and of the actual communications with clients was more accessible to Meehan and Boyle than to Parker

Coulter. Furthermore, requiring these partners to disprove causation will encourage partners in the future to disclose seasonably and fully any plans to remove cases. This disclosure will allow the partnership and the departing partner an equal opportunity to present to clients the option of continuing with the partnership or retaining the departing partner individually.[16]

We remand the case to the Superior Court for findings consistent with our conclusion that the MBC attorneys bear the burden of proof. We emphasize that we do not remand the case for the presentation of additional evidence on this issue. At trial, both parties argued whether the MBC attorneys' actions in removing cases affected the clients' right to choose, and introduced a substantial amount of evidence bearing on clients' reasons for selecting MBC. The parties have had a full opportunity to present evidence concerning what might have influenced clients' decisions, and are not now entitled to a further evidentiary hearing on this issue.

To guide the judge on remand in his reexamination of the record and his subsidiary findings, we briefly outline factors relevant to determining whether a client freely chose MBC and, thus, whether the MBC attorneys met their burden of disproving a causal relationship between their preemptive tactics and the removal of the case. We note at the outset that the partnership agreement's specific terms offer no direct assistance in resolving this issue. It is true that the partnership agreement provides that a departing partner has the right to remove any case which came to the partnership through his or her personal efforts or connections. Resorting to this provision alone to determine which cases were properly removed, however, is inappropriate. The partnership agreement states that the right to remove is subject to the client's right freely to choose who will continue handling his or her case. Thus, the parties expressly bargained with each other that they would

---

[16] As between the attorneys, a mutual letter, from both the partnership and the departing partner, outlining the separation plans and the clients' right to choose, would be an appropriate means of opening the discussion between the attorneys and their clients concerning the clients' choice of continuing representation.

allow a client a free choice. To give effect, therefore, to the entire agreement of the parties before us, there must be some examination of a client's reasons for choosing to retain MBC.

Although the record contains no evidence as to the actual preference of a particular client, expressed and unaffected by the MBC attorneys' improper communications, the record is replete with circumstantial evidence bearing on this issue. Circumstantial factors relevant to whether a client freely exercised his or her right to choose include the following: (1) who was responsible for initially attracting the client to the firm;[17] (2) who managed the case at the firm; (3) how sophisticated the client was and whether the client made the decision with full knowledge;[18] and (4) what was the reputation and skill of the

---

[17] As shown above, while specific provisions of the partnership agreement do not directly assist in resolving the causation issue, who was responsible for generating a case is nonetheless a significant factor. The attorney to whom a case is directly referred, or whose personal efforts and connections brought the case to the firm, generally has a significant, close relationship with the client or referring attorney. The partnership agreement in this case attests to the significance of this relationship within the profession. Approximately 100 of the 142 contingent fee cases removed to MBC originally were brought to Parker Coulter entirely by the efforts of Meehan, Boyle, or Schafer, and were managed solely by an MBC attorney within Parker Coulter.

On the contrary, approximately thirty-nine of the contingent fee cases, although managed by an MBC attorney, were brought to the firm entirely by a Parker Coulter attorney or were brought to the firm by a Parker Coulter attorney in conjunction with an MBC attorney. We identify these cases as the judge did. The judge found that twenty-four of the contingent fee cases removed to MBC did not originally come to Parker Coulter through the efforts or connections of an MBC attorney, or were not originally referred to an MBC attorney. These consist of Nos. 12, 17, 18, 22, 24, 40, 51, 55, 56, 59, 65, 68, 69, 74, S18, S25, S41, S42, S44, S45, Bengar, O'Brien, Gaglione, and Rotundi. The judge found that fifteen contingent fee cases came to Parker Coulter only in part through the efforts of an MBC attorney. These consist of Nos. 20, 36, 45, 46, 52, 53, 63, 67, 72, 73, 82, S19, S24, S26, and S27. The judge made no specific findings as to how three of the cases came to Parker Coulter. These cases are Nos. 7, 14, and S20.

[18] In a minor number of removed cases, the insurance defense cases, the judge found the client was sophisticated, and made the decision to retain MBC with full knowledge of the circumstances. In this situation, other factors, such as who originally brought the client in, may become less significant.

removing attorneys. Therefore, the judge is to reexamine the record and his subsidiary findings in light of the factors we have identified, and to reach a conclusion as to whether Meehan and Boyle have met their burden of proof on each of the removed cases. With the burden of proof on Meehan and Boyle, Parker Coulter will prevail if the evidence is in balance. *Trustees of Forbes Library* v. *Labor Relations Comm'n*, 384 Mass. 559, 566 (1981).

In those cases, if any, where the judge concludes, in accordance with the above analysis, that Meehan and Boyle have met their burden, we resolve the parties' dispute over fees solely under the partnership agreement.[19] Under the agreement's terms, as we have interpreted them, Meehan and Boyle owe a fair charge to their former partnership for its "services to and expenditures for" the clients in these matters. Meehan and Boyle are entitled to their combined 10.8% partnership share of this amount, and their former partners are entitled to the remainder. We agree with the judge that a "fair charge" on a removed case consists of the firm's unreimbursed expenses plus the rate billed per hour by members of the firm multiplied by the hours expended on the case.[20] In fixing this hourly rate, the firm made a determination that the time charged was reasonable and fair compensation for the services rendered. We conclude, therefore, that, in accordance with the partnership agree-

---

[19] As we noted above, Parker Coulter does not claim that Meehan and Boyle dissolved the partnership prematurely.

[20] MBC attorneys removed from Parker Coulter a number of insurance company cases, where the fee is determined on an hourly basis, and a number of contingent fee cases, where the fee does not depend on the time involved. Deciding that billable hours is a fair charge on contingent fee cases has two effects which are arguably unfair both to Parker Coulter and to MBC. If the client is unsuccessful, MBC will nonetheless have reimbursed Parker Coulter for services which generated no contingent fee. Conversely, if the client is successful, MBC will retain all the potential "windfall" of the amount by which the contingent fee exceeds MBC's investment of time in the case and its payment of a fair charge to Parker Coulter. Treating a contingent fee case as if the fee were determined on an hourly basis is justified here, however, because the parties did not bargain otherwise.

ment, Meehan and Boyle must reimburse their former partnership for time billed and expenses incurred at that firm on all cases which were fairly removed.[21] We further conclude that, under the agreement, Meehan and Boyle have the right to retain all fees generated by these cases in excess of the fair charge.[22]

We now address the correct remedy in those cases, if any, which the judge determines Meehan and Boyle unfairly removed. In light of a conclusion that Meehan and Boyle have failed to prove that certain clients would not have preferred to stay with Parker Coulter, granting Parker Coulter merely a fair charge on these cases pursuant to the partnership agreement would not make it whole. We turn, therefore, to c. 108A. Section 21 of c. 108A provides: "Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct or liquidation of the partnership . . . ." We have consistently applied this statute, and held that a partner must

---

[21] Parker Coulter does not argue that Cohen or Schafer is responsible for any portion of this fair charge. We therefore do not address this issue. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

[22] Parker Coulter claims that, even if there were no breach of duty, the provision concerning the division of unfinished business on dissolution is unenforceable because the parties reached no agreement as to a fair charge. Consequently, Parker Coulter argues, c. 108A applies which, they claim, requires MBC to wind up all removed cases for the benefit of the former partnership. These arguments are unconvincing. First, if c. 108A were to apply, both the Parker Coulter defendants and MBC would be obligated to wind up all business originated in Parker Coulter for the benefit of the dissolved firm. G. L. c. 108A, §§ 18 (f), 21, 35. See Jewel v. Boxer, 156 Cal. App. 3d 171, 177-178 (1984); Resnick v. Kaplan, 49 Md. App. 499, 507 (1982). Second, a contractual term requiring future negotiations as to specific details (a so-called "agreement to agree") is not unenforceable merely because such negotiations break down. As long as the contract, or reference to trade practice, provides "some objective method" for determining the missing term "independent of either party's mere wish or desire, . . . the court will fill the gaps." Metro-Goldwyn-Mayer, Inc. v. Scheider, 40 N.Y.2d 1069, 1071 (1976). The term "fair charge," given trade practice and evidence of a reasonable hourly billing rate, is sufficiently definite.

account for any profits which flow from a breach of fiduciary duty. *Shulkin* v. *Shulkin*, 301 Mass. 184, 192-193 (1938). *Shelley* v. *Smith*, 271 Mass. 106, 118 (1930). See *Holmes* v. *Darling*, 213 Mass. 303 (1913) (common law rule). Cf. *Production Mach. Co.* v. *Howe*, 327 Mass. 372, 378 (1951) (similar remedy for corporate fiduciary's breach); *Durfee* v. *Durfee & Canning, Inc.*, 323 Mass. 187, 198 (1948) (same). We have reasoned that this rule requiring the imposition of a constructive trust "does not rest [merely] upon the narrow ground of injury or damage to the [partnership] resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation." *Durfee, supra* at 198-199, quoting *Guth* v. *Loft, Inc.*, 23 Del. Ch. 255, 270 (1939). Under this rule, "the innocent partner is to be put as nearly as possible in the same position which he would have occupied if there had been no wrongdoing." *Shulkin, supra* at 193, quoted with approval in *Zimmerman* v. *Bogoff*, 402 Mass. 650, 661 (1988). We do not, however, seek to "deprive the wrong-doing partner of *any* participation in the fruits of his wrongful actions" (emphasis added). *Shulkin, supra* at 193. We merely require that the fruits be shared among the parties as if they had been "earned by the partnership in the usual course of its business." *Id.*

Meehan and Boyle breached the duty they owed to Parker Coulter. If the judge determines that, as a result of this breach, certain clients left the firm, Meehan and Boyle must account to the partnership for any profits they receive on these cases pursuant to c. 108A, in addition to paying the partnership a fair charge on these cases pursuant to the agreement. The "profit" on a particular case is the amount by which the fee received from the case exceeds the sum of (1) any reasonable overhead expenses MBC incurs in resolving the case, see *Jewel* v. *Boxer*, 156 Cal. App. 3d 171, 180 (1984); *Ellerby* v. *Spiezer*, 138 Ill. App. 3d 77, 83 (1985), and (2) the fair charge it owes under the partnership agreement. We emphasize that reasonable overhead expenses on a particular case are not the equivalent

of the amount represented by the hours MBC attorneys have expended on the case multiplied by their hourly billing rate. Reasonable overhead expenses are to include only MBC's costs in generating the fee, and are not to include any profit margin for MBC. We treat this profit on a particular case as if it had been earned in the usual course of business of the partnership which included Meehan and Boyle as partners. *Shulkin, supra* at 193. Failing to treat this profit as if it had been earned by Meehan or Boyle while at their former partnership would exclude Meehan and Boyle from participating in the fruits of their labors and, more importantly, would provide Parker Coulter with an unjustified windfall. Parker Coulter would receive a windfall because there is no guarantee that the profit would have been generated had the case not been handled at MBC. Meehan's and Boyle's former partners are thus entitled to their portion of the fair charge on each of the unfairly removed cases (89.2%), and to that amount of profit from an unfairly removed case which they would have enjoyed had the MBC attorneys handled the case at Parker Coulter (89.2%). *Id.*

The MBC attorneys argue that any remedy which grants Parker Coulter a recovery in excess of a fair charge on cases removed impermissibly infringes on an attorney's relationship with clients and reduces his or her incentive to use best efforts on their behalf. We agree that punitive measures may infringe on a client's right to adequate representation, and to counsel of his or her own choosing. Cf. *Jewel, supra* at 178 (how fee distributed among former partners of no concern to client); *Ellerby, supra* at 81 (same). We believe, however, that the remedy we impose does not suffer from the MBC attorneys' claimed defects. Under the constructive trust we impose, Meehan and Boyle will receive a share of the fruits of their efforts in the unfairly removed cases which is the same as that which they would have enjoyed at Parker Coulter. We note, moreover, that incentives other than profit motivate attorneys. These incentives include an attorney's ethical obligations to the client and the profession, and a concern for his or her reputation. See generally 2 A.R. Bromberg & L.E. Ribstein, Partnership § 7.08, at 7:85 (1988).

Furthermore, the MBC attorneys' argument would provide us with no mechanism to enforce the partners' fiduciary duties. Imposition of a narrowly tailored constructive trust will enforce the obligations resulting from a breach of duty and will not harm the innocent clients. We conclude, therefore, that Meehan and Boyle hold in a constructive trust for the benefit of the former partnership the profits they have derived or may derive from any cases which they unfairly removed.

We now address the consequences to Cohen and Schafer of their breach of fiduciary duty. The judge found that Cohen participated in the removal of some insurance defense cases, and that Schafer participated in the removal of a number of contingent fee cases. Therefore, we conclude that Schafer must hold in a constructive trust for the benefit of the former partnership any profits, as we have defined this term, which he has received or may receive in his separate practice from cases which the judge determines were unfairly removed. Cohen also must hold any profits she has received or may receive from unfairly removed cases in a similar constructive trust. Although Cohen and Schafer were not parties to the partnership agreement, and thus were not contractually bound to remove cases fairly, we believe their fiduciary duties require this result. See *Chelsea Indus.* v. *Gaffney*, 389 Mass. 1, 11-12 (1983).[23]

4. *Conclusion and Order.*

In sum, we conclude that the MBC attorneys' breach of duty consisted of their method of acquiring consent from clients to remove cases. We therefore limit Parker Coulter's recovery to only those losses which were caused by this breach of duty, but place on the MBC attorneys the burden of disproving causation. On remand, the judge is to determine, based on the record and his findings as they now stand, whether the MBC attorneys have met their burden as to each case removed from

[23] We dismiss Parker Coulter's claims of tortious interference with its relations with clients and employees. Parker Coulter seeks the same damages from these claimed wrongs as it sought from its breach of fiduciary duty claims, namely all fees from the cases removed to MBC. We have determined the portion of these fees to which Parker Coulter is entitled. Therefore, we do not consider further its claims of tortious interference.

Parker Coulter. A constructive trust for the benefit of the former partnership is to be imposed on any profits which Meehan, Boyle, Cohen, or Schafer receive on cases which the judge determines they unfairly removed. Because the fair charge which Meehan and Boyle owe on all removed cases is an asset of the former partnership, and because the constructive trust we impose is for the benefit of the former partnership, each former partner is entitled to his or her partnership share of these amounts. The Parker Coulter defendants are thus entitled to 89.2% of the fair charges on all removed cases, and 89.2% of the profits from the unfairly removed cases; Meehan and Boyle are entitled to 6% and 4.8%, respectively, of these amounts. Additionally, under the agreement's terms, Meehan and Boyle are to receive the return of their capital contributions and their profit shares.

The judgment below is reversed and the case is remanded to the Superior Court (1) for findings, in accordance with the factors we have identified, as to which cases were unfairly removed, (2) for a further evidentiary hearing to determine the reasonable overhead and thus the "profits" on the cases, if any, which were unfairly removed, and (3) for entry of a new judgment dispositive of all issues.

*So ordered.*