van Gestel, J.
PRELIMINARY STATEMENT OF CLAIMS TRIED
This case was tried to the Court and a jury. Which of the several counts of the complaint, the counterclaim and the third-party claim were waived or otherwise resolved and, consequently, which were actually tried and to whom, requires some explanation.
On January 31, 2005, the defendants waived Counts IV, V, VI and VII of their counterclaim and elected to proceed on Count I (declaratory relief), Count II (conversion) and Count III (breach of fiduciary duty). At the close of all the evidence, the Court directed a verdict on Count II. Thus, on the counterclaim the case went forward on Counts I and III.
On February 1, 2005, the plaintiff and the third-party plaintiffs waived Counts I, IV, V, VI, VII, VIII, IX and XI of the complaint and Counts II and III of their third-party claim and elected to proceed on the complaint on Count II (breach of fiduciary duty against Mr. Gallant), Count III (breach of fiduciary duty against Mr. Ervin), Count X (violation of G.L.c. 93A by Gallant & Ervin, LLC) and Count XII (Injunctive relief) and on Count I of the third-party claim. Thereafter, because Count I of the third-party claim was also a count against Mr. Gallant for breach of fiduciary duty, it too was waived. Consequently, on the complaint the case went forward on Counts II, III, X and XII.
All of the counts of both the plaintiffs complaint and the defendants’ counterclaim on which the case was tried, including Counts II and HI of the complaint and Count III of the counterclaim which are equity counts, see Merola v. Exergen Corp., 423 Mass. 461,462 (1996), and Count X for violations of c. 93A and Count XII seeking injunctive relief, are triable to the Court not a jury.
When the trial began on January 24, 2005, however, several other counts that were still in play presented claims triable to a jury. Thus, the case was so tried. The jury came in with its answers to special questions on February 4, 2005. By that time, the *284 waivers of counts and the direction of a verdict on one count had occurred and all that remained were non-jury claims. Nevertheless, the Court will consider the juiy’s answers to special questions as advisory, but not binding, in connection with the Court’s findings of fact and rulings of law.
FINDINGS OF FACT
The plaintiff, Lampert, Hausler & Rodman, P.C. (“LH&R”), is a Massachusetts professional corporation organized under G.L.c. 156A. LH&Ris, and always has been, a law firm with offices in Chelmsford. The firm was originally established under the name Gallant & Hausler, P.C. (“G&H”).
From 1991 through 1994 John F. Gallant (“Mr. Gallant”) and Douglas E. Hausler (“Mr. Hausler”) were the only shareholders in G&H. In 1994, Alan G. Lampert (“Mr. Lampert”) became a shareholder of G&H, and the firm’s name was changed to Gallant, Hausler & Lampert, P.C. (“GH&L”). From that time forward until the present, the three shareholders held, and still hold, equal l/3rd shares. Aside from adding Mr. Lampert as a shareholder, and experiencing two name changes, what started as G&H, became GH&L and ultimately now exists as LH&R did not change its corporate structure.
Timothy J. Ervin (“Mr. Ervin”) joined GH&L as an associate attorney on October 4, 1999. Mr. Ervin was always an employee, but never a shareholder, at GH&L.
Mr. Gallant and Mr. Ervin were both involved heavily in GH&L’s personal injury and related litigation practice. They worked closely together on the litigation matters.
From 1994 until the summer of 2000, the shareholders of GH&L ran the firm, for the most part, on a cooperative and consensual basis. However, in mid-2000, disagreements over personnel issues and personal issues began to emerge. The office relationships became strained and fractured, with Mr. Gallant, and to a somewhat lesser extent Mr. Ervin, and support staff that worked with them, becoming one faction, and Messrs. Lampert and Hausler, and support staff that worked with them, becoming another faction.
During the week of November 13, 2000, the three shareholders had a disagreement over the assignment of leave or vacation time to one of the employees, Kimberly Morin (“Ms. Morin”). Mr. Gallant had agreed to allow Ms. Morin to take certain time off. Messrs. Lampert and Hausler, when they learned about Ms. Morin’s proposed leave, disagreed. There was a clash between Ms. Morin and Mr. Lampert, and she ultimately resigned on November 17, 2000.
Intemperate words were exchanged between Mr. Gallant and Mr. Lampert over the Morin situation, and over other personnel issues and firm management. Mr. Lampert sent a particularly crude e-mail to Mr. Gallant on November 16, 2000. It read:
I am outraged reading Doug’s e-mail. I have been lied to and played with about Varina’s day off on Monday — is this the day you said ten days ago that you refused to give her? I now see and hear that there is no end in sight.
Enough of this sh[..]. I am going to exercise my right to fire any employee who is insubordinate, lies to me, calls us stupid in the office or screws us over day after day. No fIJing way will I put up with anymore of this crap. I suggest you tell Vaiina she cannot take Monday off and tell Kim she cannot take days without pay.
What else has been promised to make us continue to look like complete and total a[..]holes?
You should make a choice where you stand. I have made mine and I shall fight for this firm and am committed to stop this horror show.
Shortly thereafter, Mr. Gallant and Mr. Ervin had conversations about the possibility of leaving GH&L and forming their own law firm. These discussions began on Friday evening, November 17, 2000. Their plans evolved rapidly.
On Sunday, November 19, 2000, an internet domain name “gallantervinlaw.com” was reserved by Mr. Gallant’s mother. On Monday, November 20,2000, Mr. Ervin filed a certificate of organization with the Secretary of State for Gallant & Ervin, LLC (“G&E”). The certificate designated Messrs. Gallant and Ervin as the only two managers of the firm.
Also on November 20, 2000, Mr. Gallant sent to Mr. Hausler an e-mail indicating concern over events involving the employees on November 16 and 17, 2000. The final sentence of the e-mail read: “I am upset at what occurred on Thursday and Friday and when Agl [Mr. Lampert] returns we need to have a lengthy discussion as we can not operate a law office in this manner.”
Sometime during the week of November 20, 2000, G&E purchased advertising space in the Lowell Sun to announce the opening of G&E and offer its services to the public. Also, early that week G&E had stationery prepared.
On Wednesday, November 22,2000, G&E deposited in the mail about 180 letters addressed to 194 clients of GH&L, advising those clients of their new law firm and inviting them to transfer their business to the new firm. The letters, although mailed on November 22, 2000, were dated November 24, 2000. Messrs. Gallant and Ervin knew that Thursday, November 23, 2000, was the Thanksgiving holiday, and no mail would be delivered that day.
The letters sent to clients bore the letterhead of G&E and indicated that the address for that firm was the same address as GH&L. Also, the letters included a self-addressed, stamped return envelope and an authorization form whereon the client could indicate a preference to move his or her business to the new firm, *285 stay with Mr. Lampert “or” Mr. Hausler or go elsewhere.
The key paragraphs in the letters to clients read as follows:
Currently, we serve as' primary counsel on your behalf in connection with the matters set forth on the enclosed form. As the attorneys which have direct responsibility to you, we wish to notify you of your right to determine if those matters should remain under our supervision, be transferred to Attorney Hausler or Attorney Lampert or be transferred to a different attorney altogether. As between Gallant & Ervin or Attorney Hausler or Attorney Lampert we believe your interests will be equally served regardless of your decision.
Please remember that, as the client, you control the decision to determine who will continue to represent your interests. We remain committed to continue representing you in these matters, but shall abide by your decision should you choose to transfer to Attorney Hausler or Attorney Lampert or be transferred to a different attorney altogether. Simply, we ask you to inform us as soon as possible of your decision to ensure that your interests in these matter are properly protected.
Mr. Lampert was in Florida for the entire week of the Thanksgiving holiday, and Mr. Hausler left the office on Wednesday to travel to New Jersey and visit with his brother’s family there. Neither Mr. Lampert nor Mr. Hausler was expected back in the office until Monday, November 27, 2000. They were wholly unaware of what was happening at or about the office in Chelmsford until notified on Friday, November 24, 2000.
Neither Mr. Gallant nor Mr. Ervin told any of the GH&L employees or clients about their plans to leave until after notice was given to Messrs. Hausler and Lampert.
Several clients responded instantly to their solicitation by Messrs. Gallant and Ervin, stating their desire to transfer their business to G&E. Included among this group were Leo and Rosemary Hamel. The pending Hamel case was a personal injury claim against Malden Mills for severe personal injuries sustained by Leo Hamel, working as a plumbing contractor on a new mill facility, and for loss of consortium by his wife, Rosemary Hamel. Leo Hamel had a contingent fee agreement with GH&L at the time he transferred his case to G&E.
Early in the morning on November 24, 2000, Messrs. Gallant and Ervin delivered their resignation letters to Messrs. Lampert’s and Hausler’s desks. Because they were not there, Mr. Gallant telephoned Mr. Hausler in New Jersey and sent a facsimile notice to Mr. Lampert in Florida. In the telephone call with Mr. Hausler, Mr. Gallant stated that he was resigning, that Mr. Ervin was resigning and that they had formed G&E. Included in the letters was a paragraph that read:
Over the next few weeks we need to work out many issues concerning our separation from the firm and the continuation of the representation of clients. We should place the interest of the clients as our primary concern and work as professionals to ensure as little disruption in the business as possible.
Of course, at the time that Messrs. Lampert and Hausler read the foregoing words, a number of clients were already opening their mail, reading the letters to them from Messrs. Gallant and Ervin, filling out file transfer requests and sending them back in the self-addressed stamped envelopes provided.
Mr. Hausler reached Mr. Lampert in Florida, and they each immediately came back to Massachusetts. They met at the office, along with their associate, Mr. Rodman, at about 8:00 p.m. on Friday, November 24, 2000.
At about 11:15 p.m. that evening Mr. Gallant arrived at the GH&L office. There was a very brief and tense meeting. Mr. Hausler asked Mr. Gallant, “What are you doing? Why are you using our address?” Mr. Gallant responded, “We have to work side by side. We’ll give you 30 days. I’ve notified clients. I’ve got Hamel.” When asked by Mr. Hausler whom he contacted, Mr. Gallant said, “It’ll come in due course.” Mr. Gallant then left, and Messrs. Hausler and Lampert spent the rest of the night at the office.
Earlier, on November 24,2000, at about 10:00 p.m., Messrs. Lampert and Hausler voted to accept the resignation of Mr. Gallant as president and a director of GH&L, to change the name of GH&L to its present name, Lampert, Hausler & Rodman, P.C. and to elect Stephen J. Rodman as a director, replacing Mr. Gallant.
Messrs. Gallant and Ervin created a handwritten list of clients whom they believed would be likely to transfer their cases to G&E. This list was used in sending the several letters. A typed version of the client list was not made available to Messrs. Hausler and Lampert until December 1, 2000.
At about noon on Saturday, Messrs. Gallant and Ervin returned to the GH&L office. Messrs. Hausler and Lampert were still there, but veiy tired from being there all night. There was a very brief meeting. Because of Messrs. Lampert’s and Hausler’s exhaustion, however, the meeting ended quickly, and the parties set a time to get together again on Sunday, November 26, 2000. The Sunday meeting never occurred, however. On advice of counsel, Messrs. Hausler and Lampert called the meeting off. They also took immediate steps to secure the property, including changing the locks, changing the security code, hiring a police detail to guard the office and resolving tenancy issues with the landlord.
*286 By the end of the day on Monday, November 27, 2000, GH&L had received authorization forms from 35 clients, requesting the change from GH&L to G&E for 77 different matters. Ultimately, 85 clients, with 337 different matters, requested transfers to G&E. Included in that group were 31 unfinished contingent fee cases. GH&L complied promptly with every client’s request.
G&E continued to work on the Hamel case, which ultimately settled after trial, during appeal, for $2,700,000.00. This produced a contingent fee, plus litigation costs, to G&E of $924,506.85. It appears that this fee was the catalyst for the present lawsuit. The complaint was filed the day after judgment entered in the Hamel case.
By a Stipulation Concerning Contingent Fee Cases, admitted as Exhibit No. 42, the parties agreed that LH&R expended $94,857.90 for services rendered and $10,499.48 in expenses on those contingent fee cases in which the clients chose to follow Messrs. Gallant and Ervin to G&E.
RULINGS OF LAW
The resolution of this case depends to a significant extent on the teachings of two cases, Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578 (1975), and Meehan v. Shaughnessy, Cohen, 404 Mass. 419 (1989).
LH&R, formerly GH&L, is a professional corporation established pursuant to G.L.c. 156A. However, the founders never expended the effort to create a written agreement addressing the dissolution of the firm or the division of unfinished business thereon. Thus, when Mr. Gallant, a shareholder in GH&L, “resigned” and certain clients followed him to his new firm, G&E, the question of allocation of fees and disbursements gave birth to this lawsuit.
LH&R, seizing upon the close corporation status of the professional corporation, pressed Mr. Gallant, who is still a shareholder, to abide by his fiduciary duties. For Mr. Gallant, who established his new firm and is practicing law in the same town as LH&R, this was difficult because his mere competition was being held out as a breach.
GH&L, now LH&R, despite Mr. Gallant’s resignation, still has: three shareholders, including Mr. Gallant; illiquid stock that cannot readily be sold; and day-to-day management that consists of the shareholders, except for Mr. Gallant. LH&R is, therefore, a closely held corporation. Donahue, supra, 367 Mass, at 586. See also Demoulas v. Demoulas Supermarkets, Inc., 424 Mass. 501, 528-29 (1997). Consequently, Messrs. Gallant, Hausler and Lampert, the three shareholders, each have some significant degree of fiduciary duties to one another, just like partners in a traditional partnership.
The fiduciary duties of lawyers in a partnership to their former law firm with regard to alleged improper solicitation of clients is established in Meehan, supra, 404 Mass, at 433-38. That LH&R is a closely held professional corporation in the practice of law does not diminish those fiduciary duties. However, other factors have an effect thereon. For example, this Court carved out of the fiduciary obligations “any such fiduciary duties [as] may otherwise prohibit John F. Gallant, Alan G. Lampert or Douglas E. Hausler from practicing law in, or not within, the law firm formerly known as Gallant, Lampert & Hausler, P.C.” in a ruling before the trial began, and later clarified that ruling, as follows:
The plaintiff seeks clarification of this Court’s December 17, 2004, order for partial summary judgment. [18 Mass. L. Rptr. 614] There, the Court’s order reads:
For the foregoing reasons, the plaintiffs motion for partial summary judgment on issues of liability only with respect to Count II of the complaint and Count I of the third-party counterclaim is ALLOWED with respect to all breaches of those fiduciary duties owed by John F. Gallant to the plaintiff and with respect to all breaches of those fiduciary duties owed by Alan G. Lampert and Douglas E. Hausler to John F. Gallant, except insofar as any such fiduciary duties may otherwise prohibit John F. Gallant, Alan G. Lampert or Douglas E. Hausler from practicing law in, or not within, the law firm formerly known as Gallant, Lampert & Hausler, P.C.
In issuing the foregoing order, the Court only intended to rule that, despite being attorneys, the parties herein each have fiduciary duties to each other because they are also shareholders in a closely held corporation, carving out only those issues relating to the representation of clients. The Court did not intend thereby to determine whether any of the parties, in any way, breached those duties. Indeed, there was nothing before the Court that would have permitted such a ruling given the contested nature of almost everything between and among the parties here.
Memorandum and Order on Motion by the Plaintiff to Clarify Partial Summary Judgment, December 23, 2004.
There is a serious conflict in the law as established in Meehan between what lawyers may do when preparing for and planning to leave a law firm and the fiduciary duties that both Meehan and Donahue impose on partners in the law firm or shareholders in a closely held corporation. This conflict, however, must be resolved by higher courts than this. Until that resolution occurs, this Court must do its best to steer a proper course on the facts found.
Both Meehan and Donahue, and many cases thereafter, have described the fiduciary duly.
*287 It is well settled that partners owe each other a fiduciaiy duty of “the utmost good faith and loyalty.” ... As a fiduciaiy, a partner must consider his or her partners’ welfare, and refrain from acting for purely private gain . . . Partners thus “may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty.”... Meehan and Boyle owed their copartners at Parker Coulter a duty of the utmost good faith and loyally, and were obliged to consider their copartners’ welfare, and not merely their own.
Meehan, supra, 404 Mass, at 433-34
Just as in a partnership, the relationship among the stockholders must be one of trust, confidence and absolute loyalty if the enterprise is to succeed. Close corporations with substantial assets and with more numerous stockholders are no different from smaller close corporations in this regard. All participants rely on the fidelity and abilities of those stockholders who hold office. Disloyalty and self-seeking conduct on the part of any stockholder will engender bickering, corporate stalemates, and, perhaps, efforts to achieve dissolution.
Donahue, supra, 367 Mass, at 587.
Those grand words describe the fiduciaiy duties owed by Mr. Gallant, and probably, albeit to a lesser extent, Mr. Ervin, to GH&L, and by Mr. Gallant to Messrs. Lampert and Hausler. But how does this square with the following from Meehan, supra, 404 Mass, at 435-36?
We have stated that fiduciaries may plan to compete with the entity to which they owe allegiance, “provided that in the course of such arrangements they [do] not otherwise act in violation of their fiduciaiy duties.” ... Here, the judge found that Meehan and Boyle made certain logistical arrangements for the establishment of MBC. These arrangements included executing a lease for MBC’s office, preparing lists of clients expected to leave Parker Coulter for MBC, and obtaining financing on the basis of these lists. We believe these logistical arrangements to establish a physical plant for the new firm were permissible . . ., especially in light of the attorneys’ obligation to represent adequately any clients who might continue to retain them on their departure from Parker Coulter. Canons of Ethics and Disciplinary Rules Regulating the Practice of Law (S.J.C. Rule 3:07, Canon 7, as appearing in 382 Mass. 784 [1981]). There was no error in the judge’s determination that this conduct did not violate the partners’ fiduciaiy duty.
Lastly, Parker Coulter argues that the judge’s findings compel the conclusion that Meehan and Boyle breached their fiduciaiy duties by unfairly acquiring consent from clients to remove cases from Parker Coulter. We agree that Meehan and Boyle, through their preparation for obtaining clients’ consent, their secrecy concerning which clients they intended to take, and the substance and method of their communications with clients, obtained an unfair advantage over their former partners in breach of their fiduciaiy duties.
A partner has an obligation to “render on demand true and full information of all things affecting the partnership to any partner.” G.L.c. 108A, §20 On three separate occasions Meehan affirmatively denied to his partners, on their demand, that he had any plans for leaving the partnership. During this period of secrecy, Meehan and Boyle made preparations for obtaining removal authorizations from clients. Meehan traveled to New York to meet with a representative of USAU and interest him in the new firm Boyle prepared form letters on Parker Coulter’s letterhead for authorizations from prospective MBC clients. Thus, they were “ready to move” the instant they gave notice to their partners.
See also BBF, Inc. v. Germanium Power Devices Corp., 13 Mass.App.Ct. 166, 172 (1982).
Secret logistical arrangements to establish a physical plant for the new firm were permissible, as well as other matters of planning and preparing for the move. Thus, all that Messrs. Gallant and Ervin did from November 17, 2000, through the early morning announcement on November 24, 2000, has the apparent blessing of the Meehan court. This includes: the November 19, 2000, internet domain name reservation; the November 20, 2000, filing of a certificate of organization with the Secretary of State for G&E; the November 20, 2000, e-mail from Mr. Gallant to Mr. Hausler indicating concern over events involving the employees on November 16 and 17, 2000; the purchase of advertising space in the Lowell Sun to announce the opening of G&E and offer its services to the public the preparation of G&E stationery; and perhaps even the November 22, 2000, mailing by G&E of 180 letters to 194 clients of GH&L advising those clients of their new law firm and inviting them to transfer their business to the new firm.
“When a partner has engaged in self-dealing, that partner has the burden to prove the fairness of his actions and to prove that his actions did not result in harm to the partnership.” Starr v. Fordham, 420 Mass. 178, 183 (1995). See Meehan, supra, 404 Mass, at 441.
As intimated above, it is not easy for this Court to reconcile the 2000 Thanksgiving-week actions of Messrs. Gallant and Ervin with the concept of “a fiduciaiy duly of ‘the utmost good faith and loyalty’ ” wherein “a partner must consider his . . . partners’ welfare, and refrain from acting for purely private gain.” Meehan, supra, 404 Mass, at 433. What Messrs. Gallant and Ervin did seems more fitting in Judge Kass’s “rough and tumble of the world of commerce” than what is called for by Justice Cardozo’s “punctilio of an honor the most sensitive.” Given the law, however, this Court must follow it.
*288 But for one thing, there appears to be no breach of any fiduciary duty by either Mr. Gallant or Mr. Ervin. That one thing is the mailing of letters to clients on November 22, 2000, dated November 24, 2000, announcing the formation of G&E and soliciting and facilitating the addressees to follow them to the new firm. To use the words of Meehan, Messrs. Gallant and Ervin were “ ‘ready to move’ the instant they gave notice to their partners.” Meehan, supra, 404 Mass, at 436. However, unlike the attorneys in Meehan, neither Mr. Gallant nor Mr. Ervin made any contact of any kind with any client or employee of GH&L before their resignations early in the morning of November 24, 2000. Nor did either Mr. Gallant or Mr. Ervin deny, in the face of any demand from either Mr. Lampert or Mr. Hausler, that they had any plans for leaving GH&L. Consequently, albeit reluctantly, this Court cannot say that depositing the client solicitation letters with the Postal Service with knowledge that they would not be delivered until after their resignations were announced breached the fiduciary duties as limited by the SJC in Meehan.
LH&R also contend that the solicitation letters sent by Messrs. Gallant and Ervin to the LH&R clients were intentionally deceptive and confusing. Meehan also speaks to this issue.
Finally, the content of the letter sent to the clients was unfairly prejudicial to Parker Coulter. The ABA Committee on Ethics and Professional Responsibility, in Informal Opinion 1457 (April 29, 1980), set forth ethical standards for attorneys announcing a change in professional association. Because this standard is intended primarily to protect clients, proof by Parker Coulter of a technical violation of this standard does not aid them in their claims. See Fishman v. Brooks, 396 Mass. 643, 649 (1986). We will, however, look to this standard for general guidelines as to what partners are entitled to expect from each other concerning their joint clients on the division of their practice. The ethical standard provides that any notice explain to a client that he or she has the right to decide who will continue the representation. Here, the judge found that the notice did not “clearly present to the clients the choice they had between remaining at Parker Coulter or moving to the new firm.” By sending a one-sided announcement, on Parker Coulter letterhead, so soon after notice of their departure, Meehan and Boyle excluded their partners from effectively presenting their services as an alternative to those of Meehan and Boyle.
Meehan and Boyle could have foreseen that the news of their departure would cause a certain amount of confusion and disruption among their partners. The speed and preemptive character of their campaign to acquire clients’ consent took advantage of their partners’ confusion. By engaging in these preemptive tactics, Meehan and Boyle violated the duly of utmost good faith and loyalty which they owed their partners. Therefore, we conclude that the judge erred in deciding that Meehan and Boyle acted properly in acquiring consent to remove cases to MBC.
Meehan, supra, 404 Mass, at 437-38.
Here, unlike in Meehan, the letters were not on LH&R letterhead, nor were they one-sided. This Court finds that the letter gave the clients three options: (1) to follow Messrs. Gallant and Ervin to G&E; (2) to stay with Mr. Lampert or Mr. Hausler; or (3) to go elsewhere. The fact that they referred to Mr. Lampert “or” Mr. Hausler did not inject into the letters the kind of confusion asserted. And, perhaps most significantly, those few clients who actually testified, including Leo Hamel himself, recited clearly that they were not at all confused and that they fully understood that they had all three options. Given the lack of confusion, it cannot be said that Messrs. Gallant and Ervin excluded their partners or colleagues and LH&R from effectively presenting their services as an alternative to those of Messrs. Gallant and Ervin.
The foregoing rulings relate to the fiduciary duties of lawyers to their firm. Does the same conclusion follow with regard to Mr. Gallant’s fiduciary duties to his two fellow shareholders at the closely held corporation GH&L? There, “the relationship among the stockholders must be one of trust, confidence and absolute loyalty.” Donahue, supra, 367 Mass, at 587.
Here, this Court perceives the fiduciary duties of partners in a law firm to be at least as high, if not higher, than among stockholders in a corporation. Also, the case law on closely held corporations takes a similar approach as that in Meehan on issues relating to fiduciary duties in pre-resignation actions. See, e.g., Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 172-73 (1991). As such, the Court concludes that there was no breach here by Mr. Gallant. And, of course, Mr. Ervin had no such duly to Messrs. Lampert and Hausler because he was not a fellow stockholder of theirs.
LH&R has made a claim under G.L.c. 93A against G&E only. That claim, however, is predicated on the alleged fiduciary breaches of Messrs. Gallant and Ervin. There being no breaches on the part of Messrs. Gallant and Ervin, there can be no c. 93A violation on the part of G&E.
It has been said that in determining whether actions are unfair in the c. 93A sense, this Court “should ... focus on the nature of the challenged conduct and on the purpose and effect of that conduct.” Stagecoach Transp., Inc. v. Shuttle, Inc., 50 Mass.App.Ct 812, 817 (2001). See also Mass. Employers Ins. Exch. v. Propac-Mass, Inc., 420 Mass. 39,42-43 (1995). More recently, however, the SJC appears to have reverted back to a more objective standard:
*289 We have stated that “a practice or act will be unfair under G.L.c. 93A, Sec. 2, if it is (1) within the penumbra of a common law, statutoiy, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people.” Heller Fin. v. Insurance Co. of N. Am., 410 Mass. 400, 408 (1991). We have stated that “(t]he purpose of G.L.c. 93A is to improve the commercial relationship between consumers and business persons and to encourage more equitable behavior in the marketplace.” Poznik v. Massachusetts Med. Professional Ins. Ass’n, 471 Mass. 48, 53 (1994).
Morrison v. Toys “R" Us, Inc., Massachusetts, 441 Mass. 451, 457-58 (2004).
Here, the Court concludes that the actions of G&E clearly were not “immoral, unethical, oppressive, or unscrupulous." PMP Assocs. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975).
Further, the connection between G&E and LH&R is not clearly a “commercial relationship between consumers and business persons,” nor did the situation occur in “the marketplace.” The two law firms are, of course, in competition. But competition between lawyers in the practice of their profession cannot be prohibited by c. 93A.
The case that dominates the resolution of issues relating to competition between lawyers is found in Pettingell v. Morrison, Mahoney & Miller, 426 Mass. 253 (1997). In Pettingell, the Supreme Judicial Court clarified the law in Massachusetts under its former Rule DR 2-108(A) and, in footnote 4 at page 255, noted that substantively DR 2-108(A) is the same as Rule 5.6 of the Massachusetts Rules of Professional Conduct that became effective on January 1, 1998. Although Pettingell dealt with forfeiture provisions in an agreement, its teachings provide guidance here as well. At page 257, the SJC said:
The objective of DR 2-108(A) is to permit a lawyer who leaves a law firm to act for clients of the law firm without being discouraged from doing so by a provision for the forfeiture of funds. A forfeiture provision tends to discourage client free choice by encouraging a lawyer who leaves a firm not to compete. The broad prophylactic object of DR 2-108(A) is to forbid the inclusion of such a provision in all partnership agreements.
The SJC then went onto say, at page 258:
Without adopting a per se rule, we join with the vast majority of jurisdictions that have generally declined to give effect to forfeiture provisions... There may be situations in which, although a forfeiture provision is inappropriate, some reasonable recognition of a law firm’s loss due to the departure of a partner should be recognized, A law firm’s legitimate interest in its survival and well-being mightjustify a limitation on payments to a withdrawing partner in particular circumstances . . . but that limitation would be more difficult to justify if it applied to a withdrawing partner who competes but not to all departing partners ... A situation warranting an offsetting claim by a firm might arise when a departing partner leaves the surviving partners with onerous partnership debts, threatening the financial integrity of the firm.
(Emphasis added.)
The Pettingell court made absolutely clear that the “basic concerns of [Rule 5.6] are the interests of clients, not the interrelationship of the partners and former partners as such.” Id. at 255. ‘The strong public interest in allowing clients to retain counsel of their choice outweighs any professional benefits derived from a restrictive covenant.” Meehan, supra, 404 Mass. 431.
The concern here is to protect the clients and potential clients of the withdrawing lawyer and the law firm. An enforceable forfeiture-for-competition clause would tend to discourage a lawyer who leaves a firm from competing with it. This in turn would tend to restrict a client or potential client’s choice of counsel.
Pettingell supra, 426 Mass, at 257.
On the evidentiary record, no violations of c. 93A by G&E are shown.
Under the circumstances that have evolved, LH&R finds itself in the position of a law firm with contingent fee agreements with clients which have been terminated by those clients before achieving a contingency-triggering event. As such, LH&R is only entitled to recover in quantum meruit for the fair value of the firm’s services up to the time the representations were terminated.
When a client, for whatever reason, loses faith in his or her attorney, the client has the unqualified right to change lawyers ... “But the right of a client so to do has not much value if the client is put at risk to pay the full contract price for services not rendered and to pay a second lawyer as well.” . . . The general rule in Massachusetts is that, on discharge, an attorney has no right to recover on the contingent fee contract, but, thereafter, the attorney may recover the reasonable value of his services on a theoiy of quantum meruit.
Malonis v. Harrington, 442 Mass. 692, 700-01 (2004). See also Opert v. Melios, 41 Mass.App.Ct. 634, 636 (1993).
Messrs. Gallant and Ervin are cognizant of the fact that these quantum meruit-theoiy fees are actually the obligation of the clients,[2] not G&E. G&E, however, does not want to put its clients in the middle of this matter and, therefore, made the following statement on page 15 of Defendants’ Post-Trial Brief on Claims in Equity or Otherwise Tried to the Court:
*290 [Messrs.] Gallant and Ervin recognize that, in equity, this Court can fashion a remedy consistent with fairness. LH&R has a right to be paid some amount for the work performed on contingent fee cases where recovery to the client resulted. [Messrs.] Gallant and Ervin seek to avoid placing the clients in the middle of the dispute, and agree that the clients should not face legal action from LH&R for fees. Accordingly, [Messrs.] Gallant and Ervin agree that LH&R is entitled to payment of a fee on certain of the 30 contingent fee cases consistent with the legal standards set forth in the Court’s Memorandum and Order on “Unusual Legal Issues” Raised in the Pre-Trial Memorandum, dated January 24, 2005. [Messrs.] Gallant and Ervin suggest that the Court apply the well-stated legal standards to the contingent fee cases as reflected on Exhibit No. 42.
The situation is unusual because, for the reasons stated above, this Court has ruled that neither Mr. Gallant nor Mr. Ervin have breached any fiduciary duties to LH&R or to Messrs. Lampert and Hausler. This Court, therefore, does not believe that, even under the broad equitable powers available, it properly can enter a judgment against Messrs. Gallant and Ervin, or their law firm, compelling them to pay anything to anyone.
On the other hand, this Court should not, and it will not, stand in the way of Messrs. Gallant and Ervin making whatever payments to LH&R that they may choose on behalf of former LH&R clients that G&E represented after those clients followed Messrs. Gallant and Ervin to G&E. Without ruling, however, the Court observes that any such payments should be for all reasonable service rendered and expenses incurred on contingent fee clients that moved to G&E regardless of whether G&E has produced a successful result for them. The quantum meruit recoveries to which LH&R is entitled are for the fair value of services rendered until the time that firm was discharged as counsel. As noted above, the parties stipulated that this amounts to $105,357.38.
This Court is cognizant of the fact that its rulings are contrary to the conclusions of the jury and may not fully appreciate the intent of the SJC’s holdings in Meehan and Donahue. It intends, therefore, by this decision to try to avoid any need for a retrial should this decision be overturned on appeal. Consequently, if there was to be a finding on appeal that Mr. Gallant breached his fiduciary duties to GH&L, or to Messrs. Lampert and Hausler, and if there also was a finding that Mr. Gallant failed to meet his burden of proving that the clients would have consented to removal in the absence of any breach of duty, see Meehan, supra, 404 Mass, at 441, then this Court would assess damages against Mr. Gallant in the amount of $555,260, plus statutory interest from the date this suit was filed. This amount is derived from the contingent fee earned on the Hamel case, which is the only client on which there was even minimal evidence that his following Mr. Gallant to G&E was not proved not to have been caused by Mr. Gallant’s behavior. The Hamel fee was $924,507. However, Messrs. Lampert and Hausler advised the Court that the entire amount recovered by LH&R from Mr. Gallant on that fee would be considered wholly as profit to the firm. Thus, since Mr. Gallant is still a 1 /3rd owner of the firm, he is entitled to retain 1 /3rd of the total fee.
Mr. Gallant seeks a declaratory judgment as to his rights with respect to LH&R for purposes of getting out of the corporation. Among other things, he seeks the right to have access to the books and records of LH&R, as well as the financial information of LH&R, to determine the value of the corporation. This Court rules that Mr. Gallant, under an appropriate protective order, is entitled to examine, or have examined, those records because he is still a shareholder in LH&R.
At the same time, Mr. Gallant is a competitor of LH&R, and to that extent there must be limitations of the information he has access to and the use that may be made by him of such information. The sole purpose for which the information is to be made available to Mr. Gallant is to enable him to conduct an appraisal of the value of his 1 /3rd stock interest therein, and for no other purpose. Further, in order to protect the confidentiality of the information from Mr. Gallant, a competitor, the information shall first only be provided to Mr. Gallant’s attorney and any appraiser engaged by him. Only if those agents for Mr. Gallant are unable to understand the information for the purpose presented shall Mr. Gallant, on a properly supported motion, seek permission from the Court to examine the information himself.
Finally, Count XII of the complaint seeks injunctive relief. Given the foregoing findings and rulings there is no basis to grant the injunctive relief sought.
The parties are requested to proffer a proposed final judgment consistent with these findings and rulings.

They also undoubtedly remember the evidence presented that, at least for Mr. Hamel, he was told by Mr. Gallant not to worry about any GH&L fees because he — Mr. Gallant — would take care of them.