Holtz, Nancy Staffer, J.
I.
This matter came before the Court for a bifurcated trial. A jury was asked to decide the issue of whether or not a release signed by the plaintiff, David Perry was valid. As a result of an earlier ruling of this Court, the *377 threshold issue of whether or not a partnership among the plaintiff and the named defendants existed was reserved for the Court. This Court’s findings of fact and rulings of law follow.
II.
Based on the evidence I deem credible, together with reasonable inferences drawn therefrom, I find the following facts.
The History
Prior to engaging in private practice, Richard Stanton (“Stanton”) was employed as general counsel in the insurance company American Mutual Insurance Company. He worked there for many years, developing personal relationships with many people in the insurance industry. Ultimately, Stanton left the insurance business and became associated with two other attorneys, Neil Driscoll and Paul Gillespie. The three formed a law firm, Driscoll, Gillespie & Stanton (“DG&S”). In pursuing this venture, Stanton believed that he would be able to draw on his long-term relationships with those in the insurance industry to generate legal work, particularly in his area of specially, workers’ compensation litigation. Stanton’s belief was accurate and he quickly established himself as a highly successful workers’ compensation attorney and was able to create a successful lucrative practice focusing in this area. Over the years, DG&S had occasion to hire additional attorneys due to the success of the firm.[1] Those attorneys hired to work as associates at DG&S included the plaintiff, David Perry (“Perry”), as well as the defendants, John Lang (“Lang”), George Suslak (“Suslak”) and Mary Ann Calnan (“Calnan”).[2] The firm continued to do well enough that the principals of DG&S were able to purchase a series of adjoining office condominiums in an office park where the DG&S offices were located.
The Plan for the New Firm
In 1995, some simmering disagreements and incompatibilities among the three principals of DG&S led Stanton to decide he ought to open his own practice.
This did not come cheap. In order to finance this new venture, Stanton took out loans and was otherwise indebted in an amount in excess of $500,000. He signed notes and obtained loans in order to purchase various office equipment such as computers and other office equipment. Further, he remained liable on the mortgage and note for those parts of the office condominiums in which his new firm would be housed.[3]
Stanton’s plan was simple. Its execution, as it turned out, was not. Given that as of January 1, 1995, when the firm of Stanton & Lang was formed, Stanton was in his sixties, he wanted to create a law practice which would ensure financial security to him as he moved toward retirement and beyond. He envisioned taking a hefty draw for the immediate years of the new firm, with that number decreasing as his role and work at the new firm decreased. Even after he retired, he wanted a means to ensure an ongoing revenue stream. How was he going to do this?
Stanton was the source of over ninety percent of the insurance business which would come in to his new law firm. He was, to use the term, the rainmaker. He had the experience, connections and business savvy to maintain existing clients and ensure that in a split with DG&S, many of his insurance clients would remain loyal to him and follow him to the new firm. So business was not a problem. He needed attorneys who could do the work and who would be able to take up the reins, and run the practice after he retired. He also wanted attorneys who would be interested in an ownership interest in the firm. Stanton approached Lang, Suslak, Calnan and Perry, at varying times, and offered a place to each in his new firm. His offer was not one of partnership outright. He told each of them that he was going to be leaving the practice of law hopefully when he turned seveniy-one or seventy-two. If a plan could be worked out in which Stanton could leave the firm at about that age yet continued to be paid until he was eighty, he would be willing to make these attorneys partners. Given that he was responsible for the lion’s share of the business this proposal, to Stanton and it appears to the others, seemed reasonable. So this was the promise: a partnership interest in Stanton & Lang for each of the above attorneys if an agreement could be reached to ensure future income to Stanton after he had retired. Each of the attorneys came into the law firm of Stanton & Lang with this understanding. None of them were asked to sign on to the mortgage on their very offices. None of them were asked to sign on to the loan given to Stanton by Neil Driscoll. None of them were asked to sign on to any of the financial obligations incurred for computers, the telephone system, office furniture, etc. In short, none of the attorneys ever shared in any liability, potential or real, of the firm of Stanton & Lang. When the firm posted a loss of in excess of $180,000 in its first year, none of the so-called partners of Stanton were asked to share in this loss.
Given that all of the potential new members of Stanton’s firm were advised of Stanton’s proposal, they set about trying to create an acceptable model in which they could have an ownership interest in the firm and Stanton could in turn have financial security in his retirement years. The would-be partners met on occasion and discussed ideas for how a partnership would work. Their general plan was that they would start out at a much lower compensation level than Stanton and that level would increase over the years: simultaneously, Stanton’s compensation level would decrease and finally cease at some point (when was never decided). At the time, Stanton had a target draw of approximately $250,000, Lang, $125,000, and the others, $110,000. No plan was made as to how Stanton’s substantial capital contribution would be *378 repaid. The would-be partners continued in these discussions apparently among themselves and with Stanton, with no final agreement. They met over the course of the first year or so, never quite coming to a satisfactory agreement. In the words of Suslak, the fact that Stanton had contributed over half a million dollars to the firm while they had contributed nothing was the “six hundred pound gorilla” which was never quite resolved. Nonetheless, Suslak attempted to draft an acceptable written agreement, none of which was ever satisfactory to all. Ultimately, the discussions for a partnership became derailed or at least deferred, ironically, in 1996 when the issue of Perry’s substance abuse and effect on the firm became the focus of everyone's attention at Stanton & Lang.[4]
The Practice
The practice itself was controlled, exclusively, by Stanton. That he accepted the input and opinions of the other attorneys was at his choosing. When it came to any important decisions regarding the management of Stanton & Lang, Stanton made the decisions. From establishing the very name of the firm to setting salaries of his “partners,” to deciding to charge the firm the cost of repaying his mortgage on the office condominium regardless of what the fair market value was, all of these decisions and more were made by Richard Stanton. Votes were not taken and the other attorneys never overruled any decision of Stanton.[5] This Court finds the testimony of Perry to the effect that somehow, the other attorneys “allowed” Stanton to make these decisions to be lacking credibility. As with all decisions of the law firm, the input of the other attorneys was at all times at the sufferance of Stanton and not as of right.
In 1995, Perry billed or brought in fees which amounted to $22,000 from cases he had brought into the firm prior to the formation of Stanton & Lang. Out of the $22,000, he kept $5,000 and the remaining $16,500 was kept in the accounts of Stanton & Lang. Suslak had a similar situation with regard to his prior billings. No evidence was presented as to the nature of this money or the reason why it was contributed to Stanton & Lang, e.g. capital contribution, profits to be shared by others, etc. From all of the evidence, a fair inference can be drawn that it was part of the beginnings of the plan for a partnership, a partnership never fully realized.
Despite the fact that no agreement was ever reached among Stanton and his four colleagues, all of the attorneys, at one point or another, held themselves out as partners; each of the defendants was of the subjective belief that they were in some type of partnership at varying points in the life of the firm.
So, for all of the relevant years, 1995 through 1997, Stanton continued to run the firm solely although he treated his colleagues as partners and permitted their involvement to a limited extent in the management of the firm. For example, on occasion various of the attorneys were delegated certain management tasks such as some administrative tasks, hiring issues, decisions as to what types of equipment to buy, carpets, office furniture. As mentioned above, as for compensation, Stanton determined the salary structure. Target draws were set in which Stanton was to be paid $250-260,000 per year, Lang a lesser figure, and finally Calnan, Suslak and Perry a still lesser figure. Stanton commanded this substantially higher drawer not because he had made a substantial capital contribution. Rather this significantly higher drawer was reflective of the fact that Stanton was the rainmaker and responsible for over 90% of the firm’s business. These numbers were dependent on revenues. Other attorneys at Stanton & Lang, not the named defendants and clearly associates, were on a set salary. This structure was set down by Stanton, with no vote of the others or, in a word, a choice in the numbers being presented. Since Stanton was still interested in pursuing his goal of a partnership to ensure financial security for him, he did, however, encourage his would-be partners to continue to meet among themselves and attempt to create an acceptable arrangement upon which a partnership could be based.
The only area of general agreement among the five attorneys appears to be as to how compensation was to be set for the present year and possibly the next year or two. However, it would be more accurate to describe it as acceptance by the four attorneys of what Stanton had decided. From all of the credible testimony, this Court draws the inference that Stanton was free to change those terms at any time with no ability of the other attorneys to veto or outvote such a decision.
Even on the point of how to handle the delicate situation of Perry and his departure from the firm, Stanton made the decisions in this important matter. It was Stanton who decided to withhold Perry’s draws for two weeks in January of 1997. It was Stanton who decided to give Perry $2,000 in July of 1997. It was Stanton who met with and gave Perry the $3,000 in exchange for a general release in October of 1997. And it was Stanton who decided to give Perry an additional $1,000 despite no obligation to do so. With the exception of the decision to pay Perry $3,000, the other decisions were made by Stanton with no input from the other attorneys (and for the most part without their knowledge). In short, Stanton treated the assets of the firm of Stanton & Lang, rightly as it turned out, as his.[6]
The Financial Documents
The various financial documents marked as exhibits in this trial, such as I.R.S. FormW-2s, 1099s, K-ls, as well as financial records kept by Stanton & Lang, speak for themselves. For reasons discussed, infra, this Court draws no inference from any of the docu *379 merits on the issue of whether or not there was a partnership.
III.
G.L.c. 108A governs the formation, conduct and liquidation of partnerships in Massachusetts. Meehan v. Shaugnessey, 404 Mass. 419, 428 (1989).
G.L.c. 108A, section 6 defines a partnership as “an association of two or more persons to carry on as co-owners of a business for profit ...”
Chapter 7 of that Chapter provides that
(4) The receipt by a person of a share of a profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:
(b) as wages of an employee . . .
Other factors, in addition to those set forth in Section 7, may be considered on the issue of an existence or no existence of a partnership. These include, inter alia, (1) an agreement manifesting their intention to associate in a partnership, (2) a sharing of the profits and losses and (3) participation in the control or management of the enterprise." Fenton v. Bryan, 33 Mass.App.Ct. (1987).
A review of the credible evidence fails to provide any support for plaintiffs claim that he was a partner in the law firm of Stanton & Lang.
A simple review of the facts reveals that as of January 1, 1995, Richard Stanton was the sole owner of Stanton & Lang. The only thing the other attorneys had was a promise for the future. Certainly during 1995, even the plaintiff appears to agree that negotiations were underway to create a partnership. There was some agreement as to the concept of the decreasing/increasing compensations of Stanton versus the other attorneys, but not as to exact numbers. There was no agreement as to what to do with the reality of Stanton’s substantial capital contribution made but never repaid.
Here, the evidence is that there was an intention to form a partnership among the five attorneys, Perry and the named defendants. However, that intention was to form a partnership in the future once certain issues had been resolved. It is uncontroverted that the creation of a guarantee which would ensure Stanton financial security in the future was a sine qua non to the creation of a partnership between Stanton and the others. It simply makes no sense that Stanton would spend over a half a million dollars, would be the source of business and yet would agree to just hand over this lucrative practice without being repaid his investment or be provided a revenue stream into the future. Therefore, until that issue had been agreed upon, there is no possibility that a partnership among the five had been formed. To paraphase the self-deprecating observation of Stanton, “I may not be the smartest guy in the world, but I’m not stupid.”
As far as sharing of the profits and losses, clearly there was no sharing of losses. All of the would-be partners, including Perry, agree that Stanton provided all of the capital to start and maintain this firm and none of them were ever asked for nor did they offer to contribute themselves or to take on any of the financial obligations incurred by Stanton in furtherance of the law firm. As to profits, the plan was for each to take a target draw and the other attorneys had all agreed that the remainder would be split evenly. There is no evidence that Stanton accepted this and certainly no evidence that it ever happened. Far from sharing the profits equally, Stanton, in recognition of his role as the rainmaker in the firm, commanded a substantially higher draw than the others.
As to the participation by all of the attorneys in the control or management of the enterprise, Stanton did delegate various administrative and management functions to the other attorneys. But at all times he remained the final decisionmaker. Further, the type of management decisions which were left to the other attorneys involved things like hiring of associates, planning for the furnishing of the office and the like. When it came to issues of who would get paid what amount of money, whether Perry would stay or go, there was no vote and it appears precious little input from the other attorneys. It was and remained Stanton’s law firm throughout. The four attorneys never came to Stanton and presented a final proposal; and they certainly never informed Stanton that the majority had voted on a certain proposal and that, being outvoted, he simply had to accept the will of the majority.
The plaintiff has made much of the fact that all of the attorneys considered themselves to be partners at one time or another and held themselves out as partners to the world. Certainly if a third party such as a vendor were to have a claim against this “partnership,” these defendants would be estopped from claiming that there was no legally binding partnership. But such is not the case here.
Both the plaintiff and the defendants have asked the Court to look to various financial records, specifically tax returns, to provide support for their respective positions. However, while these exhibits can certainly be considered by the Court, they are not controlling and, in this case, are not persuasive. For example, where the plaintiff asks the Court to consider the fact that K-l forms (for partners) were issued to the other attorneys, the defendants point to the fact that in the first year of Stanton & Lang, W-2 forms (for employees) were issued to them. Further, in its first year, in the same document in which Lang is described to the I.R.S. as a “partner,” Stanton is listed as being a one hundred percent owner of the firm. The plaintiff asks this Court to consider the fact that when Perry *380 and the other attorneys received checks for work done pre-Stanton & Lang, they took their percentage share and contributed the remainder to the “partnership.” However, the plaintiff is silent in the face of overwhelming evidence that this contribution was dwarfed by that made by Stanton over the years, particularly at the inception of Stanton & Lang. Certainly, this type of payment into the firm could be evidence of a partnership. But taking this evidence in the totality of all of the circumstances, this contribution was made with the plan, hope and intention that a partnership would be formed. But as has been discussed, the attorneys went through 1995 trying to create an acceptable agreement. Certainly had any of the attorneys felt frustrated by the end of 1995 that there was still no plan for a partnership, such an attorney could have asked for that portion of the fees paid into Stanton & Lang back until an agreement was reached. But no one made such a demand because all of the parties in good faith were hying to create a partnership.
The plaintiff asks this Court to consider the fact that according to the tax filings over the years, Stanton was repaid his capital contribution and is owed nothing further. (In fact the plaintiff makes the claim that Stanton actually owes Stanton & Lang approximately $88,000.) This Court accepts the testimony of Neal Price, the accountant for Stanton & Lang, corroborated by Stanton, that it was he, Price, who decided to characterize payments to Stanton as return of capital and never at the instruction of Stanton. To accept that this Court is bound by what accounting device a C.P.A. used as being binding on Stanton would be to accept that despite being the founding partner who was almost solely responsible for the success of the firm, Stanton worked at his own firm for year after year for nothing. This proposition is patently foolish. If the firm of Stanton & Lang has, from an accounting or I.R.S. perspective, incorrectly characterized the status (partner versus employee) of these attorneys or the money they made (salary versus drawer or share of profits); or if Stanton & Lang has incorrectly carried income to Stanton as return of capital, that is between Stanton & Lang and the I.R.S. — it is not an issue for this Court.
Similarly, the plaintiff asks this Court to consider the fact that monies paid to the attorneys were styled as “drawers.” Again, how an office bookkeeper lists money paid to anyone, including these attorneys is not binding and quite frankly, not compelling. The same is true of the post-release November payment to Perry of $1,000.00. Regardless of how the bookkeeper carried it on the books, regardless of how it was reported to the I.R.S., that $1,000.00 check was a gift borne of compassion from Stanton to Periy and nothing else.
In summary, with regard to the evidence presented in the form of I.R.S. filings and other accounting and financial documents, this Court does not find any of these documents persuasive on the point of whether or not a partnership existed.
While arguing that a partnership existed, Perry never introduced any evidence as to just when that partnership began. Even by Perry’s own testimony, as late as November of 1995, at a meeting among the named defendants and himself, they were still trying to hammer out a proposal to present to Stanton for consideration. If these attorneys had not yet agreed among themselves as to a satisfactory agreement, it could hardly be said that Stanton agreed to a formula.[7]
In conclusion, while it is clear that there was a plan for a partnership in the future, such a partnership was never formed.

ORDER

It is ORDERED that judgment shall enter for the DEFENDANTS on all counts of the plaintiffs complaint.

 While there was no specific evidence on what success, if any, was enjoyed by Neil Driscoll or Paul Gillespie, this Court draws an inference from all of evidence, that the firm was as a whole, successful. In any event, the point would appear to be irrelevant.

 These attorneys will be referred from time to time as “the other attorneys.” Unless this Court specifically notes, any reference to attorneys in the firm of Stanton & Lang will only be to the named defendants and not to any other associates who may also have been employed at Stanton & Lang.

 The evidence was not entirely clear as to how the principals at DG&S finally divided up these condos. Suffice it to say, Stanton did in fact continue to have an ownership in the condominiums and ongoing financial liabilities for such ownership by way of a mortgage.

 It appears that this deadlock between Stanton and the other attorneys, understandable from all sides given their respective needs, continued after Perry’s departure and no doubt provided the impetus for each of the attorneys to ultimately leave the employ of Richard Stanton.

 For example, on the issue of the rent for the offices, no effort was ever made to determine what would be fair and reasonable (something one would expect the “partners” to demand). To the contrary, Stanton told the other attorneys what the rent was going to be: it was going to cover Stanton’s mortgage payment, condominium fees and related charges for which he was responsible.

 How these payments are listed in internal office documents or reported to the I.R.S. is not dispositive. For example, that it may have been more accurate and proper, according to the tax code, to list the $1,000 payment to Perry as a gift as opposed to a drawer, does not change the essential nature of what the payment was: a gift from Stanton to a colleague of whom he was fond and for whom he felt great empathy.

 Indeed, were this Court to find a partnership, it is stymied as to how an accounting could ever be conducted given that we do not know when the partnership began or what formula to apply. Given that all parties agree that during the relevant years of Perry’s involvement with the firm, they would not be equal, short of guessing at percentages, the Court would be unable to apply a formula to the assets and liabilities.