Leibensperger, Edward P., J.
This case presents the issue of whether restrictions imposed by an agreement on the form and scope of a physician’s practice are enforceable given the statutory bar of restrictive covenants found in G.L.c. 112, §12X. Plaintiff, Leonardo J. Velazquez, M.D. (“Dr. Velazquez”), sues seeking a declaratory judgment holding that the noncompetition and nonsolicitation provisions (“the restrictions”) imposed by two agreements he voluntarily entered into are unenforceable and void. Presently before the court is Dr. Velazquez’s motion for a preliminary injunction barring the enforcement of the restrictions. For the reasons stated below, Dr. Velazquez’s motion will be ALLOWED, in part.
*503 BACKGROUND
Dr. Velazquez is a physician, board certified as an ophthalmologist. In 2005, he began work for Eye Health Associates, LLC (“Eye Health”). Starting in 2010, Dr. Velazquez became a minority owner of Eye Health. In 2012, Eye Health, along with Dr. Velazquez and others, entered into an asset purchase agreement (“APA”) whereby substantially all of the assets of Eye Health were sold to Candescent Eye Health Surgicen-ter, LLC, a company owned by defendant Candescent Eye Holdings, LLC. The APA was entered into as of August 8, 2012. The closing of the purchase of assets pursuant to the APA occurred on December 12, 2012. Effective on December 14, 2012, Dr. Velazquez entered into an employment agreement (“EA”) with Candes-cent Eye Management, LLC and affiliated companies. [1] The companies purchasing the assets of Eye Health and subsequently employing Dr. Velazquez will be referred to, collectively, as “Candescent.” The purchase price paid by Candescent for the assets of Eye Health was approximately $14 million, of which approximately $2 million went to Dr. Velazquez.
Following the execution of the EA, Dr. Velazquez worked as a physician for Candescent. On March 3, 2014, Dr. Velazquez decided to leave Candescent. He gave his employer six months notice, as required by the EA, that he would be leaving on September 4, 2014. At the time he gave notice, Dr. Velazquez did not have lined up a private practice or an employment position as a physician. He has now, however, secured employment as a physician to begin in or about mid-September 2014. Dr. Velazquez’s new position is with Rhode Island Eye Institute where he will practice as a physician. As a condition of his employment, Dr. Velazquez is required to indemnify his new employer if litigation is brought to enforce the restrictions in the APA or EA. In addition, Dr. Velazquez is concerned that an action to enforce the restrictions may directly involve his new employer as well as his patients. He believes that enforcement of the restrictions will interfere with his ability to practice his profession and interfere with his patients’ access to their medical records.
The restrictions in the APA and the EA that are the subject of Dr. Velazquez’s complaint are nearly identical, except for the length of time that the restrictions are in place. Section 6.3 of the APA is entitled “Non-competition.” The section provides, in part, as follows:
[N]either the Sellers, nor any of the Owners [Dr. Velazquez], will, directly or indirectly, or as a stockholder, partner, member, manager, employee, consultant or other owner or participant in any Person other than the Purchasers, engage in or assist any other Person to engage in a “Prohibited Management Activity” anywhere in the Covered Area, provided, that each Owner may (a) deliver inpatient or outpatient professional health care services to patients, and (b) maintain medical staff membership or clinical privileges at any hospital, health care system, or other similar entity that offers or provides, or whose owner, parent, subsidiary or other affiliate offers or provides, acute care hospital services or facilities for inpatient care . . .
Section 6.3 defines “Covered Area” as anywhere in the United States. It defines “Noncompetition Period” as five years from the date of the closing of the transaction and, for an owner like Dr. Velazquez, two years from the termination of the provision of his services, but in no event to exceed seven years following the closing.
“Prohibited Management Activity” is defined in the APA as, “directly or indirectly, alone or with others, develop, own, manage, operate or control; or participate in the management or control of; or be employed by, consult with or provide services for; or maintain or continue any interest whatsoever (including without limitation as a direct or indirect owner), in a Covered Business.” In turn, “Covered Business” is defined as any business that provides services of a kind provided by purchaser during Dr. Velazquez’s employment. In an effort to clarify the intent of the parties with respect to allowing Dr. Velazquez to practice as a physician so long as he is employed by another institution in which he has no ownership interest, on April 14, 2014, Candescent granted a limited irrevocable waiver that modified the definition of “Prohibited Management Activity” to delete the phrase “or be employed by, consulted with or provide services for.”
The APA and EA also contain restrictions with respect to contacting patients of Candescent and assisting or requesting such patients to become patients of Dr. Velazquez after his departure from Candescent. Section 6.3 of the APA prohibits Dr. Velazquez from “directly or indirectly, [to] solicit or endeavor to entice away from the Purchasers any patients of the Business, nor affirmatively suggest, request or direct that any such patients request that their medical records be copied or otherwise removed or transferred from the Purchaser’s offices . . .”
Finally, the APA and EA prohibit Dr. Velazquez from enticing away from Candescent employees or otherwise interfering with the business relationship of any person with Candescent or interfering with the business relationship of Candescent with any customer or client supplier, vendor, or service provider to Candes-cent.
In the APA, Dr. Velazquez acknowledged that the duration, geographical scope and subject matter of the restrictions are reasonable and necessary to protect the goodwill, customer relationships, legitimate business interests, trade secrets and confidential proprietary information of Candescent. Dr. Velazquez also agreed that breach of the restrictive provisions would cause irreparable injury to Candescent.
*504 In opposition to the motion for preliminary injunction, Candescent submitted an affidavit from its chief executive officer. In the affidavit, the CEO states that Candescent has no objection to Dr. Velazquez “providing physician services to patients as a surgeon specializing in ophthalmologic and retinal surgery with Rhode Island Eye Institute.” The affidavit of the CEO does not state, however, that Candescent would not object to Dr. Velazquez assisting or soliciting patients of Candescent to become his patients at Rhode Island Eye Institute. In another affidavit from a board member of Candescent, it is stated that the restrictive covenants were intended only to restrict Dr. Velazquez’s ability to own or manage a competing business. Nevertheless, the affidavit is clear that Can-descent does not consent to Dr. Velazquez’s assisting or soliciting patients of Candescent to be treated by Dr. Velazquez or to move their medical records to Dr. Velazquez. The clear implication of both affidavits is that Candescent will seek to prohibit Dr. Velazquez from soliciting patients of Candescent when he becomes employed at Rhode Island Eye Institute.
DISCUSSION
A. STANDARDS FOR PRELIMINARY INJUNCTION
The familiar standards for a preliminary injunction are that the moving parly must show (1) a likelihood of success on the merits; (2) that irreparable harm will result from denial of the injunction; and, (3) that, in light of the plaintiffs likelihood of success on the merits, the risk of irreparable harm to the plaintiff outweighs the potential harm to the defendant in granting the injunction. Tri-Nel Management, Inc. v. Board of Health of Barnstable, 433 Mass. 217, 219 (2001), citing Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980). In applying these standards the court applies a balancing test: “What matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits. Only when the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue.” Id. In an appropriate case, “the risk of harm to the public interest also may be considered.” Brookline v. Goldstein, 388 Mass. 443, 447 (1983).
B. LIKELIHOOD OF SUCCESS
1. The Statute and Applicable Law
Dr. Velazquez argues that all of the restrictions must be declared unenforceable because they are in direct contravention of G.L.c. 112, §12X. That statute is as follows:
Any contract or agreement which creates or establishes the terms of a partnership, employment, or any other form of professional relationship with a physician registered to practice medicine pursuant to section two, which includes any restriction of the right of such physician to practice medicine in any geographic area for any period of time after the termination of such partnership, employment or professional relationship shall be void and unenforceable with respect to said restriction; provided, however, that nothing herein shall render void or unenforceable the remaining provisions of any such contract or agreement.
The language of the statute is broad — it prohibits “any restriction of the right of such physician to practice medicine.” As stated by the Supreme Judicial Court in the only appellate case applying the statute, “(i]t is obvious that [the statute] prohibits the imposition of a covenant not to compete on a physician who leaves an established practice.” Falmouth Ob-Gyn Assoc., Inc. v. Abisla, 417 Mass. 176, 178 (1994). As a further interpretive gloss on the. language of the statute, however, the Court held that “the broad term ‘any restriction’ in G.L.c. 112, §12X, was intended to encompass an agreement having a significant ‘inhibitory effect’ on a physician’s ability to practice in a particular geographic area . . .” Id. at 180.
2. Effect of Restrictions
Candescent argues that it was never the intent of the parties to the APA or EA to prohibit Dr. Velazquez from all practice as a physician when and if he left the employ of Candescent during the applicable seven-year period. Candescent points to the language in §6.3 of the APA specifically allowing deliveiy of inpatient or outpatient health care services and medical staff membership or clinical privileges. To further clarify, Candescent executed a “limited waiver” of certain language in the APA that could be read to prohibit employment of Dr. Velazquez by another entity to provide physician services. Without such waiver, it would be “obvious” (as the Supreme Judicial Court used that word in Falmouth Ob-Gyn) that the restrictions would bar any practice of medicine by Dr. Valazquez and be an illegal covenant not to compete.
Candescent must acknowledge, however, that the noncompetition and nonsolicitation provisions in the APA and EA still impose some restrictive effects upon Dr. Velazquez even if he is allowed to be employed as a physician. First, it is clear from the opposition papers and oral argument that Candescent would view it as a violation of the restrictions if Dr. Velazquez set up his own competing practice as a physician, rather than practice as an employee of Rhode Island Eye Institute. Candescent argues that because practice as an employee does not violate the restrictions, there is no “significant inhibitory effect” if practice as an owner of his own practice is prohibited. I disagree. Restricting the form of Dr. Velazquez’s practice (confining him to employment by another) is a restriction on his right to practice that is significant. The statute simply does not allow such a restriction.
The second restrictive effect that Candescent would seek to enforce arises from the provisions prohibiting Dr. Velazquez from communicating with patients of *505 Candescent, including Dr. Valazquez’s former patients. Those nonsolicitation provisions not only prohibit Dr. Velazquez from enticing or soliciting patients to come to him but also from even suggesting that a former patient (who might have sought on her own to continue with Dr. Velazquez) request the transfer of her medical records to Dr. Velazquez. It cannot be denied that such provisions come within the concept of “any restriction on the right to practice medicine” as prohibited by the statute. Further, I find that the restrictions impose a “significant inhibitoiy effect” on Dr. Velazquez’s practice. As the Supreme Judicial Court noted in Falmouth OB-Gyn, the statute makes a choice between competing policies. The statute favors the strong public interest in allowing patients to access the physician of their choice over the benefit to the medical profession of permitting noncompetition covenants. Id. at 182. The Supreme Judicial Court cited the rules pertaining to lawyers who leave their law firms to compete. The public interest in allowing clients to have the lawyer of their choice prohibits a restriction on soliciting former clients (if properly done) when the lawyer leaves. Meehan v. Shaughnessy, 404 Mass. 419, 431 (1989), cited in Falmouth Ob-Gyn at 182. The same public interest prohibits the enforcement of the nonsolicitation provisions in the APA and EA.
For the reasons stated above, I find that Dr. Velazquez has established a likelihood of success on his claim that the restrictive provisions are unenforceable pursuant to G.L.c. 112, §12X, to the extent they prohibit him from (i) practicing medicine either as an employee or as an owner of his own practice in the covered territory and (ii) communicating with, soliciting or enticing patients of Candescent.[2]
C. IRREPARABLE HARM/ BALANCE OF HARMS
The public policy embodied in G.L.c. 112, §12X establishes the irreparable harm that would be suffered by Dr. Velazquez without the issuance of a preliminary injunction. The statute makes the restrictions unenforceable. Dr. Velazquez will be harmed if he cannot freely assist any of his former patients to move their care to him, if they so choose. If Dr. Velazquez is not allowed to communicate with and solicit former patients, they may continue their care with Candescent or some other medical provider and be permanently lost to Dr. Velazquez. On the other hand, Candescent has no legitimate claim to harm as a result of application of the statute making the restrictive provisions unenforceable.
D. PUBLIC INTEREST
Enforcement of G.L.c. 112, §12X is clearly in the public interest.
ORDER ON PRELIMINARY INJUNCTION
Defendants, their- officers, agents, servants, employees and attorneys and those persons in active concert or participation with them are hereby ENJOINED from enforcing against Dr. Velazquez the provisions in the Asset Purchase Agreement and Employment Agreement (i) restricting his practice of medicine as an employee of another or as an owner of his own practice, and (ii) restricting his ability to communicate freely with patients of Candescent and to entice or invite such patients to become Dr. Velazquez’s patients.

In both the APA and the EA the parties chose Massachusetts law to apply.

At the preliminary injunction stage, I decline to address whether the provisions of the APA and EA directed to prohibiting management activity of a practice larger than Dr. Velazquez’s own practice may be enforced. The record before me does not describe any form of such management activity. Dr. Velazquez’s current employment at Rhode Island Eye Institute does not raise issues about prohibited management activity. At this point, any such management activity is hypothetical.